UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ACCUSOFT CORPORATION,                   )
                                        )
        Plaintiff,                      )
                                        )        Civil Action No.
        v.                              )        12-40007-FDS
                                        )
QUEST DIAGNOSTICS, INC., and            )
MEDPLUS, INC.,                          )
                                        )
        Defendants.                     )
_____)

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION AND DEFENDANTS' MOTION FOR PROTECTIVE ORDER

SAYLOR, J.

        This is an action for copyright infringement arising from a software-licensing dispute.

Plaintiff Accusoft Corporation holds a registered copyright on ImageGear, a computer program

that operates as a component in other software applications to provide discrete imaging functions.

Accusoft sells two types of licenses for ImageGear:  development licenses, which allow the

licensee to incorporate ImageGear into those other software applications; and distribution

licenses, which authorize distribution of those applications once ImageGear has been incorporated

into them.

        Defendant MedPlus, Inc., a subsidiary of defendant Quest Diagnostics, Inc., develops

software that is used by hospitals and other health-care providers to manage patient records and

test results.  In 2001, a predecessor to Accusoft granted MedPlus both development and

distribution licenses for ImageGear as implemented in two of the company's own software

products, ChartMaxx and eMaxx.  MedPlus later purchased a development license to incorporate ImageGear into a third product, OptiMaxx.  It eventually assigned OptiMaxx to Quest.  Niether Quest nor MedPlus ever obtained an express license from Accusoft to distribute ImageGear as implemented in OptiMaxx.

The relationship between the parties deteriorated after Accusoft discovered what it alleges are numerous unlicensed distributions of OptiMaxx and, consequently, ImageGear.  After filing suit for breach of contract and copyright infringement, Accursoft has now moved for preliminary injunctive relief prohibiting MedPlus and Quest from further use or distribution of OptiMaxx and requiring the companies to recall all existing licenses of that product.  In the alternative, it requests a prospective injunction that would prohibit further distribution of OptiMaxx (or any other program making unlicensed use of ImageGear) to new customers or facilities.  Defendants have also filed a motion for a protective order relating to 19 subpoenas that Accusoft has served on their customers.

For the following reasons, the Court finds that plaintiff has established a sufficient basis to justify limited injunctive relief that will maintain the *status quo* pending resolution of this matter. In addition, because it finds that Accusoft may more conveniently obtain the information it seeks from defendants directly, the Court will quash the subpoenas without prejudice to their re-issuance under appropriate circumstances.

## I.      Background

The following facts are taken from the parties' filings and are undisputed except where indicated otherwise.

### A.      The Parties

Plaintiff Accusoft Corporation is a Florida corporation engaged in the development and sale of a software product known as ImageGear.  (Compl. ¶¶ 2, 11).  ImageGear is a tool useful in functions such as scanning, compression, viewing, annotation, editing, processing, and printing of images.  (*Id.* ¶ 12).  Accusoft owns all copyrights, intellectual property, and licenses associated with ImageGear.  (Compl. ¶ 31, Berlin Decl. Ex. B).  It sells the program as a "software development toolkit" ("SDK") that is used by software developers, who implement ImageGear as a discrete module within other software products.  (*Id.*).  The company also sells distribution licenses for ImageGear, each of which entitles its holder to sell a product that contains ImageGear to one end user.  (Berlin Decl. ¶ 13).  These distribution licenses typically take the form of a concurrent-user license, by which the end user is permitted "to have a fixed number of individual users who are authorized to use one copy of the Application on a single personal computer or a single networked computer at the same time."  (Berlin Decl. Ex. A).

Defendant Quest Diagnostics, Inc., a Delaware corporation with its principal place of business in Madison, New Jersey, provides medical testing diagnostics, information, and services.  (Compl. ¶ 3).  It operates about fifty testing laboratories nationwide.  (Kessler Decl. ¶ 4).  Quest currently markets and provides support for OptiMaxx, a software program that is used in its testing laboratories to process and archive physician test requisitions and results.  (Kessler Decl. ¶ 5).  OptiMaxx is also licensed to about 25 third-party customers, including hospitals and other clinical facilities.  (*Id.* ¶ 6).

Defendant MedPlus, Inc., an Ohio corporation and subsidiary of Quest with its principal place of business in Mason, Ohio, develops and licenses clinical-connectivity and data-management software used by physician practices, pharmacies, hospitals, and other healthcare

providers.  (Marshall Decl. ¶ 6).  MedPlus currently has two software products that implement

ImageGear's imaging functions:  ChartMaxx and eMaxx.  (Compl. ¶ 4).  ChartMaxx is a tool for

electronic patient medical record management that is used by about 82 MedPlus customers to

manage more than 1.8 million documents.  (Marshall Decl. ¶ 11).

>    **B.**     **The ImageGear Licensing Dispute**

ImageGear was originally developed by a Delaware corporation, also called Accusoft

Corporation.  (Compl. ¶ 10, Berlin Decl. ¶ 5).  Although the record does not establish precisely

when ImageGear was created, one certificate of copyright registration for the product is dated

June 10, 1996.  (Berlin Decl. Ex. B).  Also in the 1990s, MedPlus developed and began selling

OptiMaxx.  (*Id.* ¶ 16).  At that time, OptiMaxx did not include ImageGear.  (*Id.* ¶ 16).

On November 30, 2001, Accusoft (Delaware) and MedPlus entered into a license

agreement for the development and distribution of ImageGear in ChartMaxx and eMaxx ("2001

Agreement").  (Pl.'s Mem. Ex. C).  The agreement included two development licenses, allowing

MedPlus to implement ImageGear into both of its programs.  (*Id.*).  It also granted MedPlus

4,500 concurrent-user distribution licenses.  (*Id.*).  The price for this combination of development

and distribution licenses was $90,000, payable in two installments.  (*Id.*).[1]  The agreement allowed

MedPlus to purchase additional distribution licenses as necessary, as well as annual support,

upgrades, enhancements, and license maintenance.  (Marshall Decl. Ex. A).  Section 1.2 of the

agreement limited the scope of the distribution licenses to the use of ImageGear in ChartMaxx

and eMaxx, as opposed to any other program.  (Pl.'s Mem. Ex. C).  The agreement contained an

---

[1] Since 2001, MedPlus has paid $187,500 for additional license upgrades and $281,870 for support related
to these licenses.  (*Id.* ¶¶ 13-14).

integration clause that indicated that the document constituted the entire understanding and agreement between the parties. (*Id.*). Finally, Sections 10.3 and 10.4 provided that the agreement could be modified only by written agreement and that rights under the agreement are not transferrable or assignable. (*Id.*).

In 2005, MedPlus decided to integrate ImageGear into OptiMaxx. (Marshall Decl. ¶ 17). It purchased an ImageGear development license from Accusoft in February of that year at a price of $3,995. (*Id.* Ex. F, G). In an e-mail exchange during that period, MedPlus employee Ray Mazza indicated to Accusoft employee Brendan Day that MedPlus was purchasing the new development license for its OptiMaxx product. (*Id.* Ex. H). In March 2007 and again in February 2008, MedPlus purchased maintenance support packages related to its integration of ImageGear into OptiMaxx. (*Id.* ¶¶ 20-22, Ex. L, M). It does not appear that the companies ever executed any written agreement relating to distribution of ImageGear in OptiMaxx.

By 2006, MedPlus began distributing OptiMaxx both to Quest and to third-party customers. (Marshall Decl. ¶ 23). From an e-mail exchange in which Day requested a report of the number of deployments of both ChartMaxx and OptiMaxx, it appears that Accusoft was aware that MedPlus had begun distributing OptiMaxx during that period. (*Id.* Ex. M).

In March 2008, MedPlus determined that it would cease marketing and selling OptiMaxx. (Kessler Decl. ¶ 6). At that time, OptiMaxx was in use at laboratories operated by Quest as well as at the facilities of about 25 third-party customers of MedPlus. (*Id.*). Instead of discontinuing the product, MedPlus transferred its rights in the software to Quest, and the six employees on MedPlus's former OptiMaxx team became employees of Quest. (*Id.*).

In December 2008, Accusoft (Florida), which was then operating under the name PIC

Acquisitions II, Inc., acquired the assets of Accusoft (Delaware), including all rights to ImageGear.  (Compl. ¶ 10-11).  PIC changed its name to Accusoft shortly after the acquisition.  (*Id.* ¶ 11).  Previously, Day had been the primary contact at Accusoft (Delaware) for MedPlus and Quest with respect to ImageGear licensing.  (Kessler Decl. ¶ 7).  After the sale of assets, another Accusoft employee, Leif Peters, became Quest's primary contact on issues relating to ImageGear and ImageGear licensing.  (*Id.*).

A series of e-mails between Peters and Quest employee George Kessler demonstrate that Accusoft was aware that OptiMaxx had been transferred from MedPlus to Quest earlier that year.  (Kessler Decl. Ex. A).  That exchange concluded with an invoice, dated September 30, 2009, in the amount of $1,499.50 for a renewed development license for the implementation of ImageGear in OptiMaxx.  (*Id.* Ex. A).  It is unclear whether Peters was aware of the OptiMaxx distributions at the time of those e-mails.

Peters and Kessler corresponded again in July 2010 after an accounting error at Quest resulted in its failure to pay the September 2009 invoice.  (Kessler Decl. ¶¶ 11-12).  Later that month, Peters e-mailed Kessler to ask whether distributions of OptiMaxx were being reported to Accusoft.  (*Id.* ¶¶ 13-14).  In August, Peters, Kessler, and MedPlus employee Jennifer Marshall conferred about license reporting and determined that OptiMaxx distributions had not been included in MedPlus's reports to Accusoft that had been made under the 2001 Agreement.  (*Id.* ¶¶ 15-16).  Peters expressed Accusoft's desire to bring up to date all records of OptiMaxx distributions so that appropriate billing could be completed to license those distributions.  (*Id.* ¶ 16).

In early September 2010, Peters and Kessler corresponded concerning 240 distributions of

OptiMaxx that Kessler had estimated to have occurred without a proper license.  (Kessler. Decl.

Ex. F).  In one e-mail, Peters attached a *pro forma* invoice for those previous distributions.  (*Id.*).

He also requested that the companies negotiate a written licensing agreement to cover any further

use of OptiMaxx.  (*Id.*).  He explained that the 2001 Agreement was not sufficient for that

purpose because it was not assignable and that, in any event, it only licensed the use of ImageGear

in ChartMaxx and eMaxx.  (*Id.*).  Peters assured Kessler, however, that Accusoft was "not

standing in the way of [Quest] distributing [Accusoft's] code at all" but that it would be "best for

[both companies] to have an appropriate governing license agreement in place."  (*Id.*).

In response to Peters's e-mail, Kessler stated that the fee listed in the *pro forma* invoice

seemed, at $222 per distribution, "high" compared to the $10-per-license fee Accusoft had

charged for ImageGear licenses when the OptiMaxx team was at MedPlus.  (*Id.* ¶ 18, Ex. F).

Later that month, Kessler contacted Peters to revise his estimate of the number of concurrent

users of OptiMaxx in Quest facilities.  (*Id.* ¶ 19, Ex. H).  Using what he considered to be the

industry-standard definition of "concurrent user license" as a license "based on the number of

simultaneous users accessing the program," Kessler calculated that Quest had distributed

OptiMaxx to only 17 users.  (*Id.* ¶ 19).  Peters replied that Accusoft defined the term to mean "a

licensed user with concurrent rights to use among any number of client machines [ImageGear] is

installed on."  (*Id.* ¶ 20, Ex. H).  The two were unable to come to an agreement as to the

appropriate definition to use in calculating what licensing fee was due for Quest's past

distributions of OptiMaxx.  (*Id.* ¶ 22).

On November 23, 2010, Accusoft President Jack Berlin issued a letter to Jennifer

Marshall, an employee of MedPlus, terminating the 2001 Agreement.  (Pl.'s Mem. Ex. I).  As

grounds for the termination, Berlin cited "MedPlus's transfer of distribution rights to Quest Diagnostics." (*Id.*). He demanded (1) that Quest remove Accusoft software from all MedPlus and Quest products, (2) that it exclude ImageGear from any future application created by those companies, and (3) that an officer of each company provide an affidavit stating that the software had been removed and would not be used thereafter. (*Id.*). MedPlus and Quest assert that they have made no new distributions of ChartMaxx since receiving the termination letter, but that Quest and its customers that currently hold licenses to the program continue to use it. (Marshall Decl. ¶¶ 27-29).

In September 2011, the parties appeared poised to reach a settlement of their dispute concerning unlicensed distributions of ImageGear. (Wallace Decl. ¶ 5). On September 30, 2011, Kristin Wallace, counsel for Quest, sent a proposed final agreement to Peters. (*Id.* ¶ 6). Under the proposal, Quest would pay a one-time fee of $42,500 for all distributions of ImageGear in OptiMaxx that occurred before October 1, 2011. (*Id.* Ex. A). The proposal also provided that Quest would purchase an "enterprise" license that would allow unlimited distribution of OptiMaxx with ImageGear during the period from October 1, 2011, to September 30, 2012, for a fee of $50,000. (*Id.*). The license would be renewable on an annual basis. (*Id.*).

Initially, counsel for Accusoft responded favorably to the proposal. (*Id.* ¶ 6). In fact, the company sent Quest an invoice, dated September 30, for the total amount contemplated under the proposal, $92,500. (Romeo Decl. ¶ 9). During the following week, Accusoft's Vice President of Sales and Marketing, Russ Puskaric, indicated to Quest's Director of IT Growth Initiatives, Tom Romeo, that Accusoft would prefer an agreement that resolved its disputes with both MedPlus and Quest simultaneously. (Romeo Decl. ¶ 7). However, according to Romeo, on October 7

8

Puskaric indicated that Accusoft was willing to execute an agreement that addressed only the licensing arrangement between Accusoft and Quest. (Romeo Decl. ¶ 7). On October 27, Quest's Executive Director of Enterprise Systems, Michael Hanlon, signed a copy of the proposed agreement and sent it to Accusoft. (Romeo Decl. ¶ 8, Ex. A). The document was never fully executed, however, because Accusoft continued to insist that it would only accept an agreement that simultaneously resolved its disputes with both MedPlus and Quest. (Ashley Decl. ¶¶ 9-11; Pl's Reply Ex. C, D, E; Puskarik Decl. ¶ 13). Meanwhile, Quest and MedPlus agreed that each would pay a portion of the sum due under the proposed agreement. (Romeo Decl. ¶ 11). On November 14, 2011, Quest tendered payment to Accusoft with a check in the amount of $24,444.50, which Accusoft cashed on November 25. (*Id.*).

On the same day that Quest tendered its payment, Accusoft initiated this lawsuit by filing a complaint with the United States District Court for the Middle District of Florida. The complaint contains four counts. Count 1 alleges breach of contract against MedPlus on the ground that MedPlus made distributions of ChartMaxx that were not licensed by the 2001 Agreement. Count 2 alleges copyright infringement against MedPlus on essentially the same basis. Count 3 alleges copyright infringement against Quest for its distribution of ImageGear via OptiMaxx. Count 4 alleges secondary copyright infringement against Quest on grounds that it allegedly facilitated the unlicensed distribution of ImageGear via OptiMaxx by MedPlus.

The negotiation between the parties toward an agreement appears to have continued into December 2011, although ultimately no agreement was reached. (Ashley Decl. ¶¶ 18-19). On January 26, 2011, the case was transferred to this Court because it arises in part from the 2001 Agreement, which contains a forum-selection clause specifying that any action related to the

agreement must be brought in Massachusetts.

Accusoft has now moved for preliminary injunctive relief prohibiting MedPlus and Quest from further use or distribution of OptiMaxx and requiring the companies to recall all existing licenses of that product.  In the alternative, it requests a limited, prospective injunction prohibiting further distribution of OptiMaxx or any other product that makes unlicensed use of ImageGear to new customers or facilties.  Defendants have moved for a protective order quashing 19 subpoenas *duces tecum* served by Accusoft on the grounds that those subpoenas are overly broad, duplicative, and unduly burdensome.

For the following reasons, the Court will grant a limited injunction against further distributions of OptiMaxx and any other program that makes unlicensed use of ImageGear.  It will also grant Defendants' motion for a protective order and quash the 19 subpoenas *duces tecum*.

## II.    <u>Standard of Review</u>

To obtain a preliminary injunction, "a plaintiff 'must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that the injunction is in the public interest.'"  *Peoples Fed. Sav. Bank v. People's United Bank*, 2012 WL 414251, at *6 (1st Cir. Feb. 10, 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Although each of these factors must be considered independently, the movant's likelihood of success on the merits "weighs heaviest in the decisional scales."  *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009) (citations omitted).  This focus on the likelihood of success is particularly appropriate in actions for copyright infringement because "the resolution of the other three factors often turns on the plaintiff's likelihood of success."  *Id.*

A plaintiff seeking a preliminary injunction does not bear the burden of disproving each affirmative defense asserted by the defendant. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[B]urdens at the preliminary injunction stage track the burdens at trial."). Thus, once a plaintiff establishes a likelihood of success on its *prima facie* case, the burden shifts to the opposing party to demonstrate that it is likely to prevail on one or more of its defenses.

## III.   Analysis

### A.   Likelihood of Success

Plaintiff contends that the record establishes a likelihood that it will succeed on its copyright claims. Because the 2001 Agreement did not license use of ImageGear in OptiMaxx but defendants nonetheless apparently did copy, use, and distribute that software, the Court agrees.

Computer programs are protected as "literary works" under the Copyright Act. *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 817 (1st Cir. 1995); *see* 17 U.S.C. § 102(a). The owner of a registered copyright holds an exclusive right to exclude others from copying the software, from making works derivative of it, and from distributing or using it. *See* 17 U.S.C. § 106. Both damages and injunctive relief are available as remedies for infringement of these rights. 17 U.S.C. §§ 501, 502, 504. To prevail on a claim for copyright infringement, a plaintiff must demonstrate (1) ownership of a valid copyright and (2) copying the elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A party may also infringe a copyright contributorily, or secondarily, by "intentionally inducing or encouraging direct infringement of the copyright." *MGM Studios v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

Defendants do not contest the validity of plaintiff's copyright. Nor do they contest that, between November 2001 and November 2011, they incorporated ImageGear into ChartMaxx and OptiMaxx and distributed the product for use at Quest facilities as well as by third-party customers. Thus, the sole question is whether defendants' actions amounted to unlicensed infringement.

Plaintiff's *prima facie* case of infringement through OptiMaxx deployment is relatively straightforward. It is essentially undisputed that, between 2005 and 2012, defendants incorporated ImageGear into OptiMaxx pursuant to a development license purchased in 2005. (Marshall Decl. ¶ 17, Ex. F, G, H). Maintenance support packages were purchased for this development license in 2007 and 2008. (*Id.* ¶¶ 20-22, Ex. L, M). At least before the settlement negotiations in 2011, however, the parties never executed an express distribution license agreement for OptiMaxx.

Since its creation, OptiMaxx has been copied and distributed to both Quest facilities and third-party customers. (Kessler Decl. ¶¶ 6, 24). Those distributions were not authorized by the 2001 license agreement, because that agreement applied only to use of ImageGear in ChartMaxx and eMaxx. (Pl.'s Mem. Ex. C). Defendants suggest that certain e-mails between the parties in 2005 and 2006 show that plaintiff was aware that defendants were distributing ImageGear through OptiMaxx during this period. (Marshall Decl. ¶ 18, 24, Ex. H, M). However, this awareness alone does not put OptiMaxx within the scope of the 2001 Agreement. Section 10.3 of that document provides that its terms "shall not be amended, altered, changed or modified in any way, unless agreed to in writing by both AccuSoft and Licensee." (Pl.'s Mem. Ex. C). The record does not show any such amendment to the license agreement before defendants began

distribution of OptiMaxx.  Thus, even if plaintiff's knowledge of defendants' unlicensed uses might otherwise be sufficient to create an implied license agreement, such a result is barred by the express terms of the 2001 Agreement.  The Court therefore finds that plaintiff is likely to prevail on its claims that defendants copied and distributed ImageGear without a license through their OptiMaxx product.

Defendants contend, as an affirmative defense, that the settlement negotiations of 2011 led to an accord and satisfaction of any licensing fees owed to plaintiff for distributions of OptiMaxx before 2011 as well as to an express license permitting them to continue those distributions thereafter.  However, the parties vigorously dispute whether plaintiff actually adopted the 2011 proposal.  (Wallace Decl. ¶ 5; Romeo Decl. ¶ 7; Ashley Decl. ¶¶ 7-9; Puskaric Decl. ¶¶ 10-12). For purposes of this motion, the Court finds that defendants have not met their burden of showing a likelihood of establishing that defense.[2]

### B.    <u>Irreparable Harm</u>

Plaintiff asserts that continued infringement of its copyright creates risks of irreparable harm to its interests, which include preserving the value of its intellectual property and controlling

---

[2] Even if the parties did enter into a binding agreement in 2011, defendants have not established each element of the defense.  To prove an accord and satisfaction, a defendant must show:

> (1) that there has arisen between the parties a bona fide dispute as to the existence or extent of liability; (2) that subsequent to the arising of that dispute the parties entered into an agreement under the terms of which the dispute is compromised by the payment by one party of a sum in excess of that which he admits he owes and the receipt by the other party of a sum less in amount than he claims is due him, all for the purpose of settling the dispute; and (3) a performance by the parties of that agreement.

*Rust Eng'g Co. v. Lawrence Pumps, Inc.*, 401 F. Supp. 328, 333 (D. Mass. 1975).  Here, defendants have not shown performance of the alleged 2011 agreement.  The 2011 proposal contemplated a one-time payment of $42,500 for distributions made before October 1, 2011.  (Wallace Decl. Ex. A).  Defendants assert only that they tendered, and Accusoft received, a payment of $24,444.50.  (Romeo Decl. ¶ 11).  Thus, defendants' own representations establish that any accord between the parties has not been satisfied in full.

the pricing model for distribution of ImageGear.  (Berlin Decl. ¶ 11).  These risks appear to be less severe than plaintiff fears.[3]  Nonetheless, because further distributions could pose significant risks to plaintiff's control over its intellectual property, the Court finds that circumstances do weigh in favor of injunctive relief.

Plaintiff relies in part on a traditional rule in copyright law that irreparable harm is presumed once a plaintiff has established a likelihood of success on an infringement claim.  *See, e.g., Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir. 1988).  In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006), however, the Supreme Court eschewed the use of categorical presumptions in determining the propriety of injunctive relief in a patent infringement action.  The First Circuit has not decided whether the decision in *eBay* precludes application of the traditional presumption of harm in other fields of intellectual property law.  *See Mercado-Salinas v. Bart Enter. Int'l, Ltd.*, 671 F.3d 12, 19 (1st Cir. 2011).  However, other circuits have held that it does.  *See Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 980-81 (9th Cir. 2011).

Here, the Court finds that continued (and possibly expanding) infringement of plaintiff's software presents a risk of irreparable harm that is sufficient to support a limited, prospective injunction, regardless whether a presumption to that effect is applied.  In an industry where exclusive control of intellectual property is crucial to profitability, it is understandable that plaintiff fears that unchecked distribution of its code will lead to market disadvantages that cannot be corrected.  It is therefore unnecessary for this Court to decide whether the presumption of

---

[3] For example, according to Kessler, defendant Quest has made only three additional distributions of OptiMaxx since March 2008.  (Kessler Decl. ¶ 24).

irreparable harm survives the decision in *eBay*.

Defendants suggest that the fact that plaintiff delayed bringing this lawsuit is evidence that it does not face any real risk of irreparable harm from the distribution of OptiMaxx.  Delay in filing suit may, under some circumstances, suggest that a plaintiff does not face imminent, irreversible risks.  *See, e.g.*, *Jagex Ltd. v. Impulse Software*, 750 F. Supp. 2d 228, 239 (D. Mass. 2010) ("[P]laintiff's delay in filing suit and moving for injunctive relief undermines its claim of irreparable harm.").  However, plaintiff's delay in this case is not decisive on this point.  Some evidence suggests that the degree of infringement was not evident to plaintiff for several years after it became aware that defendants were distributing ImageGear through OptiMaxx.  Furthermore, much of the delay after the transfer of OptiMaxx to Quest in 2008 resulted from efforts of the parties to resolve the dispute without resort to litigation.  It would be inequitable to find that plaintiff's attempts to resolve the instant dispute before bringing its claims to court renders it unable to seek protection from infringement now that it has.

In sum, the Court finds that although the probability that defendants' conduct during the course of this action will severely harm plaintiff's interests is low, the nature of the potential risks is substantial enough to warrant prospective injunctive relief.

### C.      Balance of Hardships

The balance of hardships in this case tilts depending on the scope of the injunctive relief that is considered.  Plaintiff initially requested an order requiring that defendants cease operation of all programs that use ImageGear other than ChartMaxx and eMaxx, recall those programs from any third-party customers currently using them, and return all copies of the software to Accusoft. (Pl.'s Mem. Ex. J).  Defendants convincingly assert that a recall on this scale would impose heavy

and unnecessary costs on it and its customers that use OptiMaxx.  Specifically, an order to recall

OptiMaxx licenses would impair the operation of record management systems in numerous

medical facilities until a version of the program that does not use ImageGear could be developed.

(Kessler Decl. ¶¶ 22-24; Marshall Decl. ¶¶ 28-29).  The Court must also consider the delay

Accusoft may experience in collecting licensing fees for those programs for which such fees have

not yet been paid and its general loss of control over its intellectual property.  (Berlin Decl. ¶ 11).

However, the balance of these relative risks weighs against issuance of so broad an injunction.

        However, the balance shifts if the potential relief is limited to measures necessary to

maintain the *status quo*.  Plaintiff's second proposed order would command defendants to halt

further distributions of the allegedly infringing applications but would not require them to recall

existing licenses or to return the software itself to Accusoft.  (Pl.'s Supp. Ex. A).  An order

enjoining new distributions of OptiMaxx will cause relatively minimal harm to defendants, who

(according to their own representation) have made only a limited number of new distributions

since 2008.  (Kessler Decl. ¶ 24; Marshall Decl. ¶ 25).[4]  On the other hand, absent at least some

prospective relief, Accusoft will have no immediate control over its proprietary software and will

remain susceptible to a risk of an unknown degree of ongoing and potentially increasing

infringement.  *See, e.g.*, *Adobe Sys. Inc. v. Kornrumpf*, 2011 WL 6303358 (N.D. Cal. Dec. 16,

2011) ("[H]arm to . . . [one's] ability to control the distribution of . . . software is sufficient to

establish irreparable harm.").  Thus, the balance of hardships favors a limited injunction that will

---

[4] These representations are somewhat suspect, given that plaintiff has offered evidence in opposition to defendants' motion for a protective order suggesting that defendant MedPlus sold at least one new OptiMaxx license in 2011.  (Pl's Opp. to Protective Order Ex. C).  Nonetheless, the Court finds defendants' statement on this subject sufficiently reliable for the proposition that new distributions of OptiMaxx are occurring only at a moderate rate, if at all.

prohibit defendants from distributing OptiMaxx licenses to new customers for the duration of this litigation.[5]

### D.    Public Interest

Generally, the public interest is served by enjoining violations of the federal copyright laws.  *See, e.g.*, *Sony BMG Music Entm't v. Tenenbaum*, 2009 WL 4723397 (D. Mass. Dec. 7, 2009).  Defendants counter that the broader injunction that plaintiff proposes would interfere with the proficient service of medical care, and that such effects are recognized to weigh against injunctive relief.  *See, e.g.*, *Datascope Corp. v. Kontron Inc.*, 786 F.2d 398, 401 (Fed. Cir. 1986) (upholding denial of injunction where district court found that the public would be harmed by withdrawing a medical product from use).  Again, this potential harm is negated if the court-ordered relief is limited to a prospective injunction against distributions of OptiMaxx to new customers.  Indeed, such an injunction would be favorable to the public because it would uphold the public's interest in copyright protection without unduly burdening medical interests.

## IV.   Motion for Protective Order

Defendants seek a protective order limiting 19 subpoenas *duces tecum* that plaintiff has served on customers of defendants that use OptiMaxx in their facilities.[6]  Defendants contend that the subpoenas are overbroad, beyond the scope of permissible discovery, and designed to harass by disrupting defendants' relationships with their customers.  They also emphasize that much of

---

[5] Of course, if existing OptiMaxx licenses will expire and require renewed license agreements, this balance holds only insofar as the injunction allows such renewals.  Otherwise, the ongoing expiration of current licenses would operate as a gradual recall with respect to those customers.

[6] Defendants seek attorney's fees under Fed. R. Civ. P. 37.  That rule, however, provides for fee-shifting only with respect to orders to compel discovery, whether ordered on motion or after a court denies a motion for a protective order.  Fed. R. Civ. P. 37(a)(1), (5).

the information sought through the subpoenas could be obtained through discovery requests directed to defendants themselves.[7]

The scope of discovery generally extends to "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). However, a court is required to limit the frequency or extent of otherwise allowable discovery if the same information "can be obtained from some other source that is more convenient, less burdensome, or less expensive . . . or [if] the burden or expense of the proposed discovery outweighs its likely benefit . . . ." Fed. R. Civ. P. 26(b)(2)(C). In addition, if a party or any person from whom discovery is sought shows good cause, a court may issue a protective order that either prohibits the discovery or prescribes its scope and nature. Fed. R. Civ. P. 26(c). *See Gill v. Gulfstream Park Racing Ass'n*, 399 F.3d 391, 402 (1st Cir. 2005) ("Under Rule 26, the trial court is required to balance the burden of proposed discovery against the likely benefit.").

Here, the discovery at issue must be limited because it is cumulative and because it can be obtained from another source that is more convenient—namely, the defendants themselves. The subpoenas, each of which is substantially identical, include 14 requests that together encompass virtually all aspects of the business relationships between defendants and their customers. (Keyes Decl. ¶ 3, Ex. A). Plaintiff has already requested that the Court compel defendants to produce a substantially similar set of information through a preliminary injunction order. (Pl.'s Supp. Ex.

---

[7] Fed. R. Civ. P. 26(c)(1) requires that a party seeking to protective order certify that it "has in good faith conferred or attempted to confer with the other affected parties in an effort to resolve the dispute without court action." *See also* Local Rule 7.1. Defendants conferred with plaintiff prior to filing their motion to note their objections to the subpoenas, and the parties discussed the possibility of stipulating a protective order to protect confidential information of the third parties. (Keyes Decl. Ex. B, C, D, E). This prerequisite to defendants' motion was therefore satisfied.

A).  That aspect of plaintiff's request will be granted, and the injunction will require defendants to produce an accounting of their OptiMaxx-licensing relationships.  Once defendants comply with that order, the parties will be better positioned to determine the need to seek additional discovery from third parties.  For the time being, at least, the expansive discovery request that plaintiff has served on Quest's customers is unduly burdensome, potentially irrelevant, and inefficient.  Because the information sought may be obtained more conveniently from defendants themselves, the subpoenas will be quashed without prejudice to renewal if additional discovery is warranted after defendants have provided the accounting that the Court will require of them.[8]

Plaintiff contends that defendants lack standing to seek this restriction on its discovery requests because the subpoenas were issued not against them but against third parties.  Some courts have denied motions to quash subpoenas under Rule 45(c) that are made by parties other than those to whom the subpoenas are directed unless the moving party can show a "claim of personal right or privilege regarding the production or testimony."  *See* 9A Wright & Miller, Federal Practice and Procedure § 2463.1 (3d ed. 2004).  That requirement—that the moving party have an interest in the subject matter of the disclosure—applies with essentially the same force to a motion for a protective order under Rule 26(c).  *See Firetrace USA, LLC v. Jesclard*, 2008 WL 5146691 (D. Ariz. Dec. 8, 2008) (finding "[t]he . . . interests required for a protective order under Rule 26(c) and the 'claim of personal right or privilege' required for a party to challenge a subpoena under Rule 45(c) to be the same.").  However, notwithstanding this

---

[8] Defendants also propose various limitations on the material subject to the subpoenas based on the relation of the material to ImageGear and the time period to which it relates.  Because it is unclear whether it will be necessary to seek discovery from the third-party customers after defendants comply with the injunction, those proposal are moot for the time being.

requirement, a party may move for a protective order "regardless of whether [it] is seeking to prevent disclosure of information by a nonparty, as long as the moving party can tie the protected information to an interest listed in the rule, such as annoyance, embarrassment, etc." *Firetrace USA, LLC v. Jesclard*, 2008 WL 5146691 (D. Ariz. Dec. 8, 2008).  Here, it is more than likely that the breadth and intrusiveness of the subpoenas will cause a degree of harm to defendants' customer relationships that is sufficient to satisfy the interest requirement of Rule 26(c).

At any rate, Rule 26(b) commands that this Court limit discovery when the information sought can be obtained from a more convenient source.  The Court may do so either "[o]n motion or on its own."  Fed. R. Civ. P. 26(b)(2)(C).  The standard for when a Court must limit discovery under Rule 26(b) is as applicable to the circumstances in this case as the terms of Rule 26(c) that permit defendants to seek a protective order.  Because this Court could effect the relief that defendants request *sua sponte*, it is not precluded from reaching the same result merely because defendants have taken the initiative.

## IV.   Conclusion

For the foregoing reasons,

1.   The motion of plaintiff for a preliminary injunction is GRANTED in part.  The terms of the preliminary injunction will be set forth in a separate order.

2.   The motion of defendants for a protective order is GRANTED; provided, however, that in lieu of a protective order, the Court hereby quashes the 19 subpoenas identified in defendants' motion, without prejudice to their renewal after defendants have produced an accounting as required by the accompanying preliminary injunction order.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  April 18, 2012