## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ACCUSOFT CORPORATION,

      Plaintiff,

v.                             Civil Action No. 4:12-cv-40007-TSH

QUEST DIAGNOSTICS INCORPORATED,
and MEDPLUS, INC.,                FILED UNDER SEAL

      Defendants.

## DEFENDANTS' OPPOSITION TO ACCUSOFT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT I OF PLAINTIFF'S AMENDED COMPLAINT (DKT 182) AND COUNTERCLAIM VIII FOR DECLARATION OF NON-BREACH OF CONTRACT BY DEFENDANT MEDPLUS (DKT 189)

Defendants MedPlus, Inc. ("MedPlus") and Quest Diagnostics Incorporated ("Quest Diagnostics") respectfully submit this Opposition to Plaintiff Accusoft Corporation's ("Accusoft") Motion for Partial Summary Judgment as to Count I of Plaintiff's Amended Complaint (Dkt 182) and Counterclaim VIII for Declaration of Non-Breach of Contract by Defendant MedPlus (Dkt 189) (Dkt. Nos. 425-426).

## REQUEST FOR ORAL ARGUMENT

Defendants request oral argument on Accusoft's motion, pursuant to Local Rule 7.1(D).

## <u>TABLE OF CONTENTS</u>

**Page**

I.    <u>SUMMARY OF REASONS TO DENY ACCUSOFT'S MOTION</u> ............................1

II.    <u>DEFENDANTS' OPPOSITION TO ACCUSOFT'S STATEMENT OF UNDISPUTED FACTS</u> ..................................................................................2

III.    <u>LAW AND ARGUMENT</u> ....................................................................................2

     A.    <u>Accusoft Failed to Establish that MedPlus Breached the 2001 Software License Agreement or that Accusoft has been Damaged.</u> ..................2

         1.    <u>Accusoft's motion is based on the incorrect assertion that the 2001 Software License Agreement is the only agreement between the parties.</u> ............................................................................2

         2.    <u>The 2003 Software License Agreement allowed MedPlus to distribute its applications pursuant to multiple distribution methods</u> ..........4

         3.    <u>MedPlus never distributed more than the 14,500 licenses purchased under the 2001 and 2003 Software License Agreements</u> ...........5

             a.    **There is only one reasonable interpretation of Concurrent User.** ............................................................6

             b.    **Accusoft's shifting interpretation of Concurrent User is inherently unreasonable and should be rejected** ........................9

             c.    **Using the only reasonable interpretation of Concurrent User, it is undisputed that MedPlus never distributed more than 13,675 licenses** ............................................10

IV.    <u>CONCLUSION</u> .................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bank v. Int'l Bus. Machs. Corp.*
145 F.3d 420 (1st Cir. 1998) ...............................................................6

*Bank v. Thermo Elemental Inc.*
451 Mass. 638, 888 N.E. 2d 897 (2008) ...........................................6

*Blueport Co., LLP v. U.S.*
71 Fed. Cl. 768 (Fed. Cl. 2006) .........................................................3

*Bose Corp. v. Ejaz*
No. 11-10629-DJC, 2012 WL 4052861 (D. Mass. Sept. 13, 2012) .....................................8

*Crowe v. Bolduc*
365 F.3d 86 (1st Cir. 2004) ................................................................9

*Den Norske Bank AS v. First Nat'l Bank of Boston*
75 F.3d 49 (1st Cir. 1996) ..................................................................6

*Doe v. Walker*
746 F. Supp. 2d 667 (D. Md. 2010) ..................................................8

*Fairfield 274-278 Clarendon Trust v. Dwek*
970 F.2d 990 (1st Cir. 1992) ..............................................................6

*Farmers Ins. Exch. v. RNK, Inc.*
632 F.3d 777 (1st Cir. 2011) ..............................................................6

*Gibraltar Fin. Corp. v. Lumbermens Mut. Cas. Co.*
400 Mass. 870, 513 N.E.2d 681 (1987) ............................................9

*I & R Mech., Inc. v. Hazelton Mfg. Co.*
62 Mass. App. Ct. 452, 817 N.E. 2d 799 (2004) ...............................3

*Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*
387 F. Supp. 2d 521 (M.D.N.C. 2005) ..............................................8

*Michelson v. Digital Fin. Servs.*
167 F.3d 715 (1st Cir. 1999) ..............................................................2

*Newburgh v. Florsheim Shoe Co.*
200 F. Supp. 599 (D. Mass. 1961) .....................................................3

iii

*Nicolaci v. Anapol*
   387 F.3d 21 (1st Cir. 2004).................................................................6

*Rivera v. Centro Medico de Turabo, Inc.*
   575 F.3d 10 (1st Cir. 2009)................................................................3

*Seaco Ins. Co. v. Barbosa*
   435 Mass. 772, 761 N.E. 2d 946 (2002)............................................6

*Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC*
   No. 09-cv-11873, 2014 WL 1278012 (D. Mass. March 26, 2014).....................2

*Suffolk Const. Co., Inc. v. Illinois Union Ins. Co.*
   80 Mass. App. Ct. 90, 951 N.E.2d 944 (2011)...................................8

*VICI Racing, LLC v. T-Mobile USA, Inc.*
   Nos. 13-1615, 13-1780, 2014 WL 3930025 (3d Cir. 2014)...................8

*Wall Data, Inc. v. Los Angeles Cnty. Sheriff's Dep't*
   447 F.3d 769 (9th Cir. 2006)..............................................................8

*Woodward v. Emulex Corp.*
   854 F. Supp. 2d 149 (D. Mass. 2012)................................................8

## I.     SUMMARY OF REASONS TO DENY ACCUSOFT'S MOTION

Accusoft's motion for partial summary judgment should be denied because the undisputed facts show that MedPlus did not breach the 2001 Software License Agreement. Accusoft's motion is premised on three demonstrably incorrect assertions:  (1) that Accusoft and MedPlus entered into only one software license agreement; (2) that MedPlus distributed its software applications in a manner that was not authorized by Accusoft; and (3) that MedPlus distributed more than the 14,500 "concurrent user" licenses it purchased.  All of these assertions are plainly wrong as the following chart illustrates:

| **Accusoft's Claims** | **MedPlus' Response** |
|---|---|
| • On November 30, 2001, MedPlus entered into a written license agreement with Accusoft.  Dkt. No. 426, p. 3. | • While this is a correct statement, Accusoft *ignores* that the parties subsequently entered into the November 2003 Software License Agreement.  Dkt. No. 414, pp. 11-13, ¶¶ 54-60. |
| • MedPlus breached the 2001 Software License Agreement by distributing ImageGear through distribution methods other than the Concurrent User Distribution Method.  Dkt. No. 426, p. 3, Section B. | • MedPlus was authorized to distribute ImageGear by the Concurrent User, Site License, and Client/Server Distribution Methods under the 2003 Software License Agreement, which authorized the acts Accusoft cites.  Dkt. No. 414, pp. 11-13, ¶¶ 54-60. |
| • MedPlus breached the 2001 Software License Agreement by "distributing ImageGear in excess of the 14,500 concurrent user deployment licenses purchased by MedPlus."  Dkt. No. 426, p. 12. | • The undisputed evidence shows that the total number of Concurrent User licenses distributed by MedPlus was 13,675.  Dkt. No. 414, pp. 19-20, ¶¶ 91-97. |

As the above chart shows, Accusoft's motion is premised on an incomplete statement of the relevant facts.  This 2003 Software License Agreement allowed MedPlus to distribute its software products using multiple Distribution Methods, including the "Concurrent User" or "Site License" Distribution Methods, and that is exactly and only what MedPlus did.  Accusoft's

motion should be denied and Defendants' cross-motion for summary judgment should be granted.  *See* Dkt. No. 413.

## II.      DEFENDANTS' OPPOSITION TO ACCUSOFT'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1, Defendants submit with this Opposition a separate opposition to Accusoft's statement of the undisputed material facts.

## III.      LAW AND ARGUMENT

### A.      Accusoft Failed to Establish that MedPlus Breached the 2001 Software License Agreement or that Accusoft has been Damaged.

To prevail on a breach of contract claim under Massachusetts law, Accusoft must establish: "(1) a binding contract; (2) breach of a specific provision of the contract; and (3) damages flowing therefrom." *Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC*, 09-cv-11873, 2014 WL 1278012, at *3 (D. Mass. March 26, 2014) (citing *Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999)).  As the following analysis demonstrates, Accusoft failed to establish elements two and three of its breach of contract claim.  Therefore, Accusoft is not entitled to summary judgment on Count I of Accusoft's Amended Complaint or on MedPlus' Counterclaim VIII for Declaration of Non-Breach of Contract.

### 1.      Accusoft's motion is based on the incorrect assertion that the 2001 Software License Agreement is the only agreement between the parties.

Accusoft's motion is based on a demonstrably false "fact": that MedPlus and Accusoft entered into *only* the 2001 Software License Agreement.  Dkt. No. 426, p. 2.  While there is no dispute that Accusoft and MedPlus entered into the 2001 Software License Agreement, it is also undisputed that Accusoft and MedPlus entered into the subsequent 2003 Software License Agreement that substantially altered the parties' licensing relationship.

A contract is formed when the parties manifest assent to its terms. *I & R Mech., Inc. v. Hazelton Mfg. Co.*, 62 Mass. App. Ct. 452, 454-55, 817 N.E. 2d 799 (2004).  Assent can be manifested in a number of ways, but "signing" or "initialing" a written document has always been considered the hallmark of assent.  *Bose Corp. v. Ejaz*, No. 11-10629-DJC, 2012 WL 4052861, at *4 (D. Mass. Sept. 13, 2012); *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 22 (1st Cir. 2009) (initials can signify assent to the terms of a contract).  Moreover, the conduct of the parties can also manifest the requisite assent.  *Newburgh v. Florsheim Shoe Co.*, 200 F. Supp. 599, 602 (D. Mass. 1961).  If the facts are undisputed, the court can determine whether a contract has been formed.  *Cmty. Builders, Inc. v. Indian Motorcycle Assocs., Inc.*, 44 Mass. App. Ct. 537, 548, 692 N.E. 2d 964 (1998).

Here, there is no genuine dispute that MedPlus and Accusoft entered into the 2003 Software License Agreement regarding "ImageGear version 13" and any subsequent "upgrades or enhancements to the Product."  MedPlus presented the November 17, 2003 Order Form and Amended Software License Agreement to Accusoft.  Dkt. No. 414, p. 12, ¶ 57.  Accusoft's general counsel signed the Order Form, initialed each page of the Amended Software License Agreement (Dkt. No. 414, p. 12, ¶ 58), and testified that ██████████████████████ ████████████████████████████████████████.  Dkt. No. 414, pp. 12-13, ¶ 59. MedPlus paid the $50,000 set forth on the Order Form.  Dkt. No. 414, p. 13, ¶ 61.

Further, Accusoft representatives repeatedly referenced the existence of the 2003 Software License Agreement in subsequent communications.  In 2005, Brendan Day, Accusoft's Account Executive for the MedPlus account, ██████████████████████████████ ████████████████████████████████████████.  Dkt. No. 414, p. 15, ¶ 73.  In 2005, general counsel for both companies had extensive email communications regarding the

"2003 Agreement" 

█████████████████████████████████████. Dkt. No. 414, p. 16, ¶ 77. ████████████

██████████████████████████████████████████████████████████████████████

████████████████████████. Dkt. No. 414, pp. 16-17, ¶¶ 77-78. This undisputed evidence

makes it clear that the parties entered a binding, enforceable 2003 Software License Agreement

comprised of the November 17, 2003 Order Form and the 2003 Amended Software License

Agreement.

Thus, as of November 26, 2003, the parties' relationship regarding "ImageGear version

13" and subsequent versions was governed by the 2003 Software License Agreement. This

agreement substantially altered their licensing relationship.

    2.   The 2003 Software License Agreement allowed MedPlus to distribute its
applications pursuant to multiple distribution methods.

Under the 2003 Software License Agreement, MedPlus had the right to "Distribute" its

Applications to "End Users," i.e., MedPlus' customers, pursuant to the "Distribution License"

contained in Section 2.3:

> Section 2.3. Distribution License. Subject to the terms and conditions set
> forth in this Agreement, Accusoft grants Licensee a non-exclusive, non-
> transferable, worldwide license to distribute to End Users (either directly
> or indirectly) a copy of one or more distributable files in any applications
> developed pursuant to Section 2.2 by the Distribution Method identified
> on the Order Form during the Term of the Agreement...

Dkt. No. 415, p. 424. The Order Form permitted three different "Distribution Methods": the

"Client/Server," the "Concurrent User," and the "Site License" Methods. Dkt. No. 414, p. 13, ¶

60. MedPlus distributed its software products pursuant to the "Concurrent User" and "Site

License" Methods, which are defined as follows:

> "Concurrent User" means the End User is permitted to have a fixed
> number of individual users who are authorized to use one copy of the

Application on a single personal computer or a single networked computer at the same time.

"Site License" means the End User is permitted to install the Distributable File on one or more networked or non-networked computers for use at the End User's site.  For the purposes of this definition, if Licensee licenses its Application on a site license basis, Licensee shall make a good faith estimate as to the maximum number of Concurrent Users that could access the Distributable Files at any one time, and shall use a Concurrent User license for each such Concurrent User.  Licensee's good faith estimate shall be based on the internal estimates that Licensee uses for itself to price such Site License for the End User.  If Licensee determines that a Site has more Concurrent Users than its original good faith estimate, Licensee shall use additional Concurrent User licenses to cover such increase.[1]

Dkt. No. 415, p. 423, Sections 1.7(b), (e).

Accusoft granted MedPlus the right to distribute its Applications using the "Concurrent User" and "Site License" Distribution Methods.  Thus, Accusoft's claim that MedPlus breached because it distributed its Applications by Distribution Methods other than the "Concurrent User" Method is unsupportable.

3.   MedPlus never distributed more than the 14,500 licenses purchased under the 2001 and 2003 Software License Agreements.

Accusoft's argument that MedPlus distributed more than 14,500 licenses should be rejected for two reasons.  First, there is only one reasonable interpretation of Concurrent User under the agreements: the number of simultaneous users of MedPlus' Applications.  Accusoft relies on an unreasonable interpretation of Concurrent User to inflate the number of licenses MedPlus allegedly distributed.  Second, using the only reasonable definition of Concurrent User,

---

[1] As the definition of Site License demonstrates, MedPlus was authorized to distribute its Applications without limiting the number of installations and to calculate the number of Concurrent Users by a good faith estimate of the number of users that could access the Applications at any one time.

It is undisputed that MedPlus distributed less than the 14,500 licenses purchased under to the 2001 and 2003 Software License Agreements.

### a.      There is only one reasonable interpretation of Concurrent User.

"[I]nterpretation of a contract is ordinarily a question of law for the court." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 783 (1st Cir. 2011). A court interpreting a contract must first assess whether the contract is ambiguous: "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Bank v. Thermo Elemental Inc.,* 451 Mass. 638, 648, 888 N.E. 2d 897 (2008). "Ambiguity is not created merely because the litigants disagree about the meaning of a contract." *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004). Rather, "a contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998) (quotations and citations omitted). The meaning of an unambiguous contract term is a question of law, while the meaning of an ambiguous contract term is a question of fact. *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779, 761 N.E. 2d 946 (2002); *see also Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir. 1992). "Should the court find the contract language unambiguous, we interpret it according to its plain terms." *Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 52 (1st Cir. 1996). Summary judgment is appropriate when those plain terms unambiguously favor either side. *Int'l Bus. Machs. Corp.*, 145 F.3d at 424.

Here, there is only one reasonable meaning of the term "Concurrent User" as defined in the 2001 and 2003 Software License Agreements. The meaning is readily explained by this simple diagram:



**End User = Hospital**

**Single personal computers each contain a copy of the MedPlus Application**

**Each individual user can use a copy of the MedPlus Application at the same time as the remaining two users are using a copy of that same MedPlus Application**

**The "fixed number of individual users" is set to "3"**

As this diagram shows, the "End User" is a typical MedPlus customer, a hospital. The "fixed number of individual users" are the users of the MedPlus Application at the hospital. In this particular example, the fixed number of individual users is set to "3." What the "Concurrent User" definition plainly means is that each individual user can use "one copy" of the Application on a "single personal computer" at the same time as both of the other two users are using "one copy" of the Application on their respective single personal computers. With the "fixed number of individual users" being set to "3," this would be a three "Concurrent User" license that allowed three individual users to use the Application at the same time, i.e., concurrently.

This interpretation is consistent with multiple sources that show the plain meaning of "Concurrent User." For example, the Ninth Circuit has defined a "concurrent user" software license as follows:

> A concurrent user license allows multiple users to access the same software, **but limits the number of simultaneous computer users to the number of licenses purchased**. For example, where a licensee purchases five concurrent use licenses, five people would be able to access the

> software, but when the sixth person tried to access the software, access
> would be denied.

*Wall Data, Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 786 n.8 (9th Cir. 2006) (emphasis supplied).

Additionally, courts routinely consult dictionary definitions to arrive at the plain meaning of a term in a contract. *Suffolk Const. Co., Inc. v. Illinois Union Ins. Co.*, 80 Mass. App. Ct. 90, 94, 951 N.E.2d 944 (2011) (noting that "established dictionaries can furnish the approved natural meaning of disputed terms"). The Merriam-Webster Online Dictionary defines "concurrent" as: "operating or occurring at the same time" and "running parallel." Dkt. No. 414, p. 18, ¶ 89. Webopedia defines a "Concurrent Use" as:

> The phrase used to describe a type of purchase or license agreement that is based on the number of simultaneous users accessing the software. For example a 10-user concurrent use license would allow ten users to log in and use the software at one time, but the eleventh user attempting to log in would be blocked, and unable to initiate a session until one user logs out.

Dkt. No. 414, pp. 18-19, ¶ 89.[2]

Finally, this Court may take judicial notice of matters of public record from sources--such as the United Government Accountability Office ("GAO")--whose accuracy cannot be reasonably questioned. *Doe v. Walker*, 746 F. Supp. 2d 667, 678 n. 14 (D. Md. 2010) (taking judicial notice of GAO report regarding international mailing times to troops overseas). The GAO, in explaining different types of software licensing models, stated as follows about a

---

[2] Webopedia.com has been used by multiple courts when considering technological terms. *See, e.g., VICI Racing, LLC v. T-Mobile USA, Inc.*, Nos. 13-1615, 13-1780, 2014 WL 3930025, at *26 (3d Cir. 2014) (considering Webopedia definition of "telematics" in contract dispute); *Blueport Co., LLP v. U.S.*, 71 Fed. Cl. 768, 770 (Fed. Cl. 2006) (considering Webopedia definition of "hack" in describing background of software copyright dispute); *Woodward v. Emulex Corp.*, 854 F. Supp. 2d 149, 153 (D. Mass. 2012) (considering Webopedia definition of "OEM" to discuss background facts in employment case); *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 528 (M.D.N.C. 2005) (considering Webopedia definition of "metadata" in discussing programs at issue in software copyright dispute).

"concurrent usage" software license: "Concurrent usage: This type of license allows a specified number of users to connect simultaneously to a software application."   Dkt. No. 414, p. 19, ¶ 90.

In light of the above, the only reasonable interpretation of Concurrent User is the number of individual users that can simultaneously use MedPlus' Applications.

> ### b.     Accusoft's shifting interpretation of Concurrent User is inherently unreasonable and should be rejected.

Accusoft contends that "Concurrent User" is synonymous with the number of "enabled authorized users" of the MedPlus application <u>regardless of whether those users were using the application at the same time</u>.  Dkt. No. 426, p. 8.[3]  This interpretation of Concurrent User finds no support in the plain language of the 2001 and 2003 Software License Agreements or case law.

Accusoft's interpretation violates a fundamental tenant of contract interpretation: "a contract should also be interpreted in a manner which avoids meaningless words."  *Gibraltar Fin. Corp. v. Lumbermens Mut. Cas. Co.*, 400 Mass. 870, 872, 513 N.E.2d 681 (1987); *Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004) ("we are not so struthious as to ignore plain language, nor are we at liberty to disregard the terms purposefully inserted into an agreement by experienced businessmen").   Accusoft's "authorized user" definition cannot be reasonable because it ignores the "at the same time" language in the definition of Concurrent User.   If Concurrent Users meant total "authorized users," as asserted by Accusoft, then the phrase "at the same time" would be meaningless.   An interpretation such as Accusoft's that makes words or phrases meaningless in a contract *cannot* be reasonable.

In light of the above, the contract term "Concurrent User" can only mean the number of simultaneous users of the MedPlus Application.   MedPlus calculated the number of "Concurrent

---

[3]   Previously, however, Accusoft also contended that Concurrent User means total number of ███████████████████████████████████████████████████.   Dkt. No. 414, p. 23, ¶ 112. However, Accusoft does not proffer this alternative interpretation in this motion.

Users" by assessing how many individual users at a given site would be using the software at the same time.  Dkt. No. 414, p. 17, ¶ 82.  This is exactly what the 2001 and 2003 Software License Agreements required.  As such, Accusoft's motion should be denied.

> **c.      Using the only reasonable interpretation of Concurrent User, it is undisputed that MedPlus never distributed more than 13,675 licenses.**

In 2001, MedPlus purchased 4,500 "Concurrent User" licenses pursuant to the 2001 Software License Agreement.  Dkt. No. 182-1, p. 3.  Pursuant to the 2003 Software License Agreement, MedPlus purchased 5,000 "Concurrent User" licenses, and then 5,000 more in 2006. Dkt. No. 415, p. 422; Dkt. No. 182-3, p. 5.  Thus, MedPlus purchased a total of 14,500 Concurrent User licenses.  Utilizing the only reasonable interpretation of Concurrent User--the number of individual users who could simultaneously access MedPlus' Applications--the undisputed evidence shows that MedPlus distributed no more than ▮▮▮ Concurrent User licenses.  Dkt. No. 414, p. 20, ¶ 97.

As to its ChartMaxx application, MedPlus has maintained a database of ChartMaxx Concurrent Users, with data beginning in Quarter 1 of 2009 ("ChartMaxx Dashboard").  Dkt. No. 414, p. 19, ¶ 91.   A MedPlus server recorded the Concurrent Users of ChartMaxx approximately every 10 minutes for each ChartMaxx customer that could be recorded.  *Id*.  The maximum number of Concurrent Users of ChartMaxx occurred in Quarter 1 of 2012 and amounted to ▮▮▮ Concurrent Users.  Dkt. No. 414, p. 19, ¶ 92.

As to concurrent usage of MedPlus' OptiMaxx application, OptiMaxx licenses were distributed to internal Quest Diagnostics business units as well as outside customers.  Dkt. No. 414, p. 19, ¶ 93.  Quest Diagnostics provided an accounting for OptiMaxx usage at internal business units and outside customers.  Dkt. No. 414, pp. 19-20, ¶¶ 94-95.  Based on this accounting, the maximum Concurrent User license distributions of OptiMaxx at Quest

Diagnostics internal business units was ███, and the maximum Concurrent User License distributions of OptiMaxx to outside customers was ███, for a total number of approximately ███ OptiMaxx Concurrent Users.  Dkt. No. 414, p. 20, ¶ 96.

As to MedPlus' eMaxx Application, the ImageGear executable files listed in Article 11 of the 2001 Software License Agreement were "incorporated" into ChartMaxx 3.31, which was used by the eMaxx system starting in approximately June of 2004.  Dkt. No. 414, p. 9, ¶ 44.  No other version of ImageGear was incorporated into ChartMaxx version 3.31 or eMaxx.  *Id*.; Dkt. No. 266-1, pp. 9-10.  Even though the 2001 ImageGear Library was incorporated into eMaxx, MedPlus never distributed any ImageGear executable files to eMaxx users because they were not provided a copy of the software.  Dkt. No. 414, pp. 9, ¶ 44.  Under the 2001 Software License Agreement, a "Distribution" only occurs if an <u>actual copy</u> of the software product is provided to the End User.  Dkt. No. 182-1, p. 3, Article 1, Section 1.4.  Also, there is no evidence that any eMaxx user ever used eMaxx in a way that triggered ImageGear's functionality.  Dkt. No. 414, pp. 8-10, ¶¶ 41, 43, 47.

Thus, the maximum Concurrent User count for ChartMaxx, OptiMaxx, and eMaxx is ███ (Dkt. No. 414, p. 20, ¶ 97), which is less than the 14,500 Concurrent User licenses allowed.  MedPlus did not exceed the maximum number of allowed distributions, and cannot be liable for breach of contract.

## IV.   <u>CONCLUSION</u>

For all of the above reasons, Accusoft's Motion for Partial Summary Judgment as to Count I of Plaintiff's Amended Complaint (Dkt 182) and Counterclaim VIII for Declaration of Non-Breach of Contract by Defendant MedPlus (Dkt 189) should be denied.

Dated: October 17, 2014.

Respectfully submitted,

*/s/ J. Michael Keyes*
J. Michael Keyes (pro hac vice)        John J. Cotter (BBO #5540524)
Whitney J. Stowe (pro hac vice)        William G. Potter (BBO #664302)
K&L Gates LLP                          Emily H. Tseng (BBO #675962)
618 West Riverside Avenue              K&L Gates LLP
Suite 300                              One Lincoln Street
Spokane, WA 99201-5102                 State Street Financial Center
(509) 624-2100 (phone)                 Boston, MA 02111
(509) 456-0146 (fax)                   (617) 261-3100 (phone)
mike.keyes@klgates.com                 (617) 261-3175 (fax)
whitney.stowe@klgates.com              john.cotter@klgates.com
                                       william.potter@klgates.com
                                       emily.tseng@klgates.com

*Counsel for Defendants Quest Diagnostics Incorporated and MedPlus, Inc.*

12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent by U.S. Mail to those indicated as non-registered participants on:  N/A.

<u>*/s/ J. Michael Keyes*</u>
J. Michael Keyes (Pro Hac Vice)