**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ACCUSOFT CORP., | ) | |
| Plaintiff, | ) | |
|  | ) | |
|  | ) | |
| v. | ) | CIVIL ACTION |
|  | ) | NO. 12-40007-TSH |
| QUEST DIAGNOSTICS, et al. | ) | |
| Defendants. | ) | |
|  | ) | |

**REPORT AND RECOMMENDATION**

**July 24, 2015**

Hennessy, M.J.

By Order of Reference dated September 9, 2014, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket # 428), this matter was referred to me for a Report and Recommendation on Plaintiff Accusoft Corporation's ("Accusoft") motion for summary judgment on certain of Defendant Quest Diagnostics Incorporated's ("Quest") counterclaims and affirmative defenses (Docket #410). For the reasons that follow, I RECOMMEND that Accusoft's motion be DENIED.

I.   BACKGROUND[1, 2]

Accusoft is a Florida corporation in the business of creating, producing, selling, and distributing computer software that improves and enhances software solutions. (PF #1).[3] In

---

[1] The following recitation of facts is assumed as true only for purposes of the instant motion.

[2] In its statement of facts, Accusoft refers to the conduct of the parties during discussions concerning settlement of this action. (Docket #411 at 8-9). Such evidence is inadmissible and will not be considered. See Fed. R. Evid. 408(a)(2). Even if this evidence were to be considered, it would not affect the undersigned's findings.

[3] The term "PF" refers to Plaintiff Accusoft's Facts. Accusoft's facts can be found in its Statement of Undisputed Facts which are incorporated within its memorandum of law (Docket #411). Accusoft did not number its facts; however, Defendants MedPlus and Quest numbered Accusoft's facts in their response to Accusoft's statement.

December 2008, Accusoft acquired the assets of a Delaware corporation named Accusoft Corporation ("Accusoft Delaware"), including Accusoft Delaware's rights in software known as ImageGear. (PF #2). ImageGear is a software development toolkit that allows software developers to implement discrete imaging functionality into a software product, which Accusoft licenses for both development and distribution. (PF #3, 5).

MedPlus Inc ("MedPlus"), a wholly owned subsidiary of Quest, is a developer and integrator of clinical connectivity and data management solutions. (PF #8). ChartMaxx is a computer program developed by MedPlus that provides electronic patient medical record management. (PF #9). On November 30, 2001, MedPlus entered into a written license agreement with Accusoft Delaware that allowed MedPlus to incorporate ImageGear into ChartMaxx and another program, eMaxx, and then distribute those programs to third parties (the "2001 ImageGear License"). (PF #10).

OptiMaxx is a computer program that was developed by MedPlus in the 1990s. (PF #11). MedPlus began incorporating ImageGear into OptiMaxx in 2005. (PF #13). MedPlus distributed OptiMaxx. (PF #14). The six MedPlus employees that were responsible for maintaining the OptiMaxx program became Quest employees in March of 2008 and continued to perform the same duties they had as MedPlus employees. (Docket #36-1 at ¶¶ 3, 6).

By at least August 2010, a dispute had arisen among Accusoft, MedPlus, and Quest as to alleged out-of-license activities by MedPlus related to ChartMaxx and alleged activities of Quest and MedPlus related to OptiMaxx. (PF #15). On September 1, 2010, Leif Peters, Accusoft's Healthcare Development Manager, emailed George Kessler, Quest's Manager of OptiMaxx Support, noting that the 2001 ImageGear License between Accusoft and MedPlus was not

---

(Docket #461). This Court will use the numbering system created by Defendants, and any reference to "PF" can be understood by looking to the Defendants' response at Docket #461.

assignable and also that the agreement did not include OptiMaxx. (PF #16). Peters stated in the email that a license agreement between Accusoft and Quest would need to be drafted and that while "[Accusoft is] not standing in the way of distributing our code at all, we just think it best for each of us to have an appropriate governing license agreement in place with all the proper warrants and reps for Quest's use in the OptiMaxx and other possible systems." (PF #16). Thereafter, the parties engaged in unsuccessful negotiations and, when no resolution was reached by November 23, 2010, Accusoft's President Jack Berlin sent a letter to MedPlus terminating the 2001 ImageGear License. (PF #17).

Beginning in December 2010, Evelyn Ashley, outside legal counsel for Accusoft, began communicating with general counsel for MedPlus and with Quest's in-house counsel, Kristen Wallace, concerning the alleged out-of-license activities of MedPlus and Quest, and seeking to negotiate a settlement of the disputes. (PF #18). While Accusoft was open to two separate documents or license agreements, one for Quest and one for MedPlus, Ashley and others at Accusoft made it clear that without final and signed agreements with both entities, there would be no settlement with either Defendant. (Docket #411-4 at ¶ 8). These discussions continued into August of 2011, at which time Quest asked Wallace to contact Ashley to negotiate an agreement between Quest and Accusoft regarding OptiMaxx. (Docket #411-6 at ¶ 4).

Tom Romeo, Quest's Director of Billing Operations, participated in a conference call in September 2011 with Michael Hanlon, Quest's Executive Director of Enterprise Systems; April Wagner of Quest's procurement division; Russ Puskaric, Accusoft's Vice President of Sales and Marketing; and Accusoft's legal counsel to discuss a potential agreement between Accusoft and Quest. (PF #23). During this call, Puskaric and Ashley communicated Accusoft's desire to

reach a "joint deal," i.e., an arrangement with both Quest and MedPlus with respect to OptiMaxx and ChartMaxx. (PF #24).

On September 30, 2011, Wallace sent a proposed written agreement (the "Proposed 2011 License") to Ashley, Puskaric, Peters, and Berlin under which Accusoft would grant Quest a one-year enterprise license to use ImageGear in OptiMaxx for $50,000 and Quest would pay a one-time fee of $42,500 for its past distributions of ImageGear in OptiMaxx. (PF #25). Ashley responded the same day indicating that, to move forward, the Proposed 2011 License would need an attachment listing legacy customers for OptiMaxx and that a separate agreement would also need to be reached between Accusoft and MedPlus concerning ChartMaxx. (PF #26).

On October 3, 2011, Wallace sent Ashley; Puskaric; Peters; Keith Johnson, counsel for MedPlus; and Berlin the Proposed 2011 License with the completed legacy customer attachment. (PF #27; Docket #37-4). In response, Berlin sent an email to Johnson, Wallace, Ashley, and Puskaric stating, "This is an all or nothing deal folks…. I had not planned to drag this into a new quarter, so what is the current hold-up? I heard the final bell sound already." (Docket #37-4). Later that day, Accusoft sent an invoice to Quest dated September 30, 2011, in the amount of $92,500, which referenced a price of $42,500 for "Cure for imageGear License Fees for past installations through 9/30/11" and a price of $50,000 for "Annual ImageGear Enterprise License Fee 10/1/11-9/30/12." (Docket #525-3 at 15-16). In his deposition, Berlin stated that this invoice was sent to Quest because it appeared that an agreement was close to being finalized based on the phone conversation and Accusoft wanted any commission to be booked that quarter to Peters. (Docket #411-8 at 9-10).

On October 4, 2011, Wagner sent an email to Ashley, copying Wallace, stating that she was in the process of obtaining signatures on the Proposed 2011 License and processing the

invoice. (Docket #37-5). Ashley responded immediately with an email to Wagner, copying Wallace and Berlin, stating, "we don't have a deal on ChartMaxx and so that puts your agreement in re: Optimaxx in jeopardy – as I have said repeatedly in my emails. Without agreement on both, we have no deal on either." (Docket #37-5).

On October 7, 2011, Romeo and Puskaric had a telephone call during which Romeo "explained to [Puskaric] that [Quest and Med Plus] essentially operated as separate companies, that [Quest] wanted to build on its business relationship with Accusoft, that [Quest] was ready to sign the agreement with Accusoft, and Accusoft should move forward and let the MedPlus/ChartMaxx agreement be a separate deal." (PF #30). "Puskaric agreed and asked that [Quest] sign the [Proposed 2011 License], e-mail it to him as a .pdf attachment and he would execute the document on his side and send it back to [Quest]." (PF #31).

On that same day, Accusoft issued a credit memo to Quest in the amount of $92,500, referencing a credit in the amount of $42,500 for "Cure for imageGear License Fees for past installations through 9/30/11" and a credit in the amount of $50,000 for "Annual ImageGear Enterprise License Fee: 10/1/11-9/30/12." (Docket #525-3 at 112). It is unclear whether the phone call between Romeo and Puskaric occurred before or after the credit memo was issued. Both the invoice issued on October 3, 2011 and the credit memo issued on October 7, 2011 were for sales order #1813. (Id. at 94, 112).

On October 27, 2011, Hanlon executed a copy of the Proposed 2011 License and Wagner emailed it to Puskaric, stating "Please sign on the Accusoft side and return a fully executed agreement to me either via email or to the address listed below." (PF #34; Docket #417 at 6). One hour later, Puskaric emailed Ed Bayliss at MedPlus stating that he had received the "fully executed license for Quest." (Docket #37-7 at 2). Puskaric stated, "Once I receive the document

5

signed from MedPlus this entire matter between Accusoft and Quest/MedPlus is behind us." (Id.). There is no evidence that anyone at Quest was aware of this email; in fact, Puskaric stated in the email that he "hope[d] to keep this communication confidential." (Id.). After learning of Quest's execution of the Proposed 2011 License, Berlin went back to his counsel and said, "it's all or nothing."[4] (Docket #411-8).

Quest sent a check to Accusoft, dated November 16, 2011, in the amount of $24,444.50, which Accusoft cashed on November 25, 2011.[5] (PF No. 37). Quest claims that the November 16, 2011 payment was a partial payment for the invoice sent from Accusoft on October 3, 2011. (PF No. 38).

II.  STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the

---

[4] At his deposition, Berlin further stated, "And we immediately went back to your side and said, it's all or nothing." (Docket #411-8). This answer was made with respect to a question asked by Attorney Michael Keyes who represented both Quest and MedPlus in this matter. (Docket #411-8). Thus, there is some ambiguity as to whether this statement was made to Quest or solely to MedPlus. As Accusoft is moving for summary judgment, the court must view the facts in the light most favorable to Quest. Hence, the undersigned cannot conclude that Quest was aware of this statement.

[5] Accusoft emphasizes that this check is dated two days after it filed the Complaint in this case. (Docket #411 at 8). However, the undersigned notes that service was not executed on Quest until November 18, 2011, two days after the date on the check. (Docket #16).

6

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

III. ANALYSIS

Accusoft seeks summary judgment on 1) Quest's breach of contract claim asserted in count I of the counterclaims; 2) Quest's anticipatory repudiation claim asserted in count III of the counterclaims; and 3) Quest's estoppel claim asserted in count IV of the counterclaims.[6] (Docket #410 at 1). Accusoft asserts that summary judgment is appropriate as to these claims because they are barred by the Florida Uniform Commercial Code (U.C.C.) Statute of Frauds and because Quest cannot prove that Accusoft intended to be bound by the alleged oral agreement. (Id.). Accusoft also seeks summary judgment on Quests' second, third, sixth, tenth, and eleventh affirmative defenses based on the same reasoning.[7] (Id. at 1-2).

A. Florida U.C.C.

Florida has adopted the U.C.C. which applies to contracts for the sale of goods. Fla. Stat. §§ 672.101-672.724. The vast majority of courts addressing the issue have found that software constitutes "goods" under the U.C.C. and software licensing agreements fall under the U.C.C. Tingley Sys. v. Healthlink, Inc., 509 F. Supp. 2d 1209, 1214 n.3 (M.D. Fla. 2007) (citing cases); First Nationwide Bank v. Fla. Software Servs., Inc., 770 F. Supp. 1537, 1542 (M.D. Fla. 1991). Pursuant to the Florida Statute of Frauds:

> [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker.

---

[6] The Defendants' answer and counterclaims are available at Docket #189.

[7] In its motion, Accusoft also seeks summary judgment on both Defendants' ninth affirmative defense of accord and satisfaction. (Docket #411 at 21). On October 17, 2014, Defendants withdrew this affirmative defense. (Docket #440).

7

Fla. Stat. § 672.201(1).

Accusoft argues that, because no writing signed by Accusoft exists that indicates an agreement was consummated during the October 7, 2011 telephone call between Romeo and Puskaric, there is no enforceable contract and Quest's counterclaim for breach of contract must be dismissed. (Docket #411 at 12). Accusoft further argues that, without an enforceable contract, Quest's counterclaim for anticipatory repudiation would also fail as a matter of law. (Id.). Quest asserts that the Florida Statute of Frauds does not bar its claim for two reasons. First, Quest argues that the written invoice issued by Accusoft to Quest is sufficient to satisfy the Statute of Frauds. (Docket #464 at 7-10). Second, Quest asserts that the $24,444.50 check tendered by Quest and cashed by Accusoft operates as a partial payment, thereby removing the contract from the Statute of Frauds analysis. (Id. at 6-7). I address these arguments in turn.

    1.    Memorandum Satisfying the Statute

Quest argues that the Florida Statute of Frauds does not bar its claim because Accusoft issued a written invoice to Defendants. (Docket #464 at 7). "The [Florida] Statute of Frauds does not require that the contract for the sale of goods be in writing; rather, the Statute requires only 'some writing sufficient to indicate that a contract for sale has been made between the parties.'" Impossible Elecs. Techniques, Inc. v. Wackenhut Protective Sys., Inc., 669 F.2d 1026, 1033 (5th Cir. 1982)[8] (quoting Fla. Stat. § 672.201(1)). "An adequate memorandum 'may be in almost any possible form.'" Id. at 1034 (quoting Rank v. Sullivan, 132 So. 2d 32, 36 (Fla. Dist. Ct. App. 1961)). According to the Uniform Commercial Code Official Comment No. 1:

> Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second,

---

[8] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by a Unit B panel of the former Fifth Circuit. Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982). Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc. is an opinion by the Unit B panel of the former Fifth Circuit.

8

it must be "signed," a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

In Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc., the Fifth Circuit addressed whether a purchase order was a writing sufficient to indicate that a contract for sale had been made pursuant to the Statute of Frauds. The appellant claimed that an oral contract for sale of a closed-circuit television camera security system was made between itself and the appellee. Id. at 1029. Following the alleged oral contract, a purchase order was issued by the appellee. Id. The Fifth Circuit found that the purchase order clearly satisfied the second and third prongs of the requirements outlined in the Uniform Commercial Code Official Comment No. 1 – it was signed by an authorized employee and it correctly specified the quantity of goods to be sold. Id. at 1034. With respect to the first requirement, the Fifth Circuit found that the purchase order evidenced a contract but there remained a factual question as to whom the contract was between, thereby making summary judgment inappropriate. Id.

On October 3, 2011, Accusoft issued an invoice, dated September 30, 2011, in the amount of $92,500, which referenced a price of $42,500 for "Cure for imageGear License Fees for past installations through 9/30/11" and a price of $50,000 for "Annual ImageGear Enterprise License Fee: 10/1/11-9/30/12." (PF No. 38; Docket #525-3 at 15-16). Quest, citing Impossible Electronics, asserts that this invoice is sufficient to overcome the Florida Statute of Frauds. (Docket #464 at 4). However, unlike in Impossible Electronics, the invoice here was issued four days prior to the alleged oral contract of October 7, 2011. Quest does not allege that any agreement occurred prior to that date. Hence, the invoice does not qualify as a "writing sufficient to indicate that a contract for sale has been made between the parties" so as to overcome the Statute of Frauds. See Fla. Stat. § 672.201(1); cf. Ashland Oil, Inc. v. Pickard, 269 So. 2d 714, 721-22 (Fla. Dist. Ct. App. 1972) (holding that telegram which recognized the

9

unsigned written agreement, sent one year after the agreement was prepared, constituted a sufficient signed memorandum for purposes of the Statute of Frauds), cited in Impossible Electronics, 669 F.2d at 1034; Rank, 132 So. 2d at 36 ("A memorandum that is adequate to satisfy the requisites of the [Statute of Frauds, relating to contracts to sell personalty,] may be in almost any possible form. A will may constitute a sufficient memorandum of an antecedent contract.") (emphasis added), cited in Impossible Electronics, 669 F.2d at 1034.

    2.    Partial Payment

On November 16, 2011, Quest tendered $24,444.50 via check to Accusoft. Accusoft cashed that check on November 25, 2011 and has never returned these funds. Quest characterizes this sum as a partial payment and asserts that such payment removes the contract from the Statute of Frauds analysis. (Docket #464 at 2). Accusoft responds that there is no evidence that it accepted the check as a partial payment under the alleged oral contract. (Docket #487 at 4). Accusoft asserts that it cashed the check solely because of its business practice of cashing all checks received and notes that the check made no reference to any specific invoice, transaction, contract, or alleged agreement; was for a peculiar amount with no evident relation to any particular invoice or transaction; and was unaccompanied by any correspondence or documentation relating the check in any way to the alleged oral agreement or invoice. (Id.).

A contract which does not satisfy the requirements of Fla. Stat. § 672.201(1), but which is valid in other respects, is enforceable "[w]ith respect to goods for which payment has been made and accepted or which have been received and accepted."[9] Fla. Stat. 672.201(3)(c). Payment need not be in full, a down payment is sufficient. Bertram Yacht Sales, Inc. v. West,

---

[9] As neither party addresses whether the alleged contract was divisible, the undersigned does not explore that issue in this Report and Recommendation. See Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc., 659 F. Supp. 2d 332, 343 (N.D.N.Y. 2009) (explaining the distinction for purposes of the Statute of Frauds between a single indivisible product and divisible units of sale).

209 So. 2d 677, 679 (Fla. Dist. Ct. App. 1978) ("The making of a down payment by the purchaser took the contract for sale of the boat out of the statute of frauds, by express provision in the statute."); see Tara Prods. v. Hollywood Gadgets, Inc., No. 09-CV-61436, 2010 U.S. Dist. LEXIS 37889, at *18 (S.D. Fla. Apr. 16, 2010) (holding that allegation that defendant made partial payments for goods was sufficient to except the alleged implied in fact contract from the Florida Statute of Frauds).

Although Accusoft asserts that it never accepted the payment, and only cashed the proffered check because it had a business practice of cashing all checks received, it never explains why it retained the funds or in what manner it held the funds. Nor is there unrefuted evidence in the record that would explain why Quest would tender such a sum to Accusoft if not for the purpose of a payment on the alleged oral contract. See Songbird Jet, Ltd. v. Amax, Inc., 581 F. Supp. 912, 923 (S.D.N.Y. 1984) (holding that the Statute of Frauds did not bar plaintiff's claim for breach of contract due to partial payment on contract price of $8,850,000, stating that plaintiff's payment of $250,000 to defendant "would be, to say the least, extraordinary and unintelligible in the absence of an explanation, which plaintiffs contend must be that the payment was on an account for the purchase price for the [good][.]"). The undersigned finds that this is sufficient to raise a question of fact as to whether Accusoft accepted the partial payment by Quest, thereby removing the alleged oral contract from the Statute of Frauds analysis. Hence, the undersigned finds that the Florida Statute of Frauds does not bar Quest's claims.

B.  Ratification

Accusoft argues that even if Quest's claims are not barred by the Florida Statute of Frauds, summary judgment is still appropriate because, on the undisputed evidence, no reasonable juror could conclude that Accusoft assented to be bound by the unsigned Proposed

2011 License or by any oral promise by Puskaric. (Docket #411 at 13). Accusoft asserts that Puskaric did not have the authority to agree to a separate deal with Quest and that the course of the parties' negotiations reveals that the parties intended that any agreement would only be binding upon the execution of a final, written contract. (Id. at 16). However, the undersigned need not address these issues. Regardless of whether Accusoft intended to be bound by the alleged oral contract, there are material questions of fact as to whether Accusoft subsequently ratified the contract.

Quest asserts that, even if Accusoft did not intend to be bound by the alleged oral contract, Accusoft's issuance of a purchase order and acceptance of Quest's payment constitute a ratification of the agreement. (Docket #464 at 10-11). Accusoft argues that the sending and cancelling of the invoice could not have ratified a subsequent agreement. (Docket #487 at 8-9). Accusoft further argues that its cashing of the check, in the ordinary course of business, where the check was unaccompanied by any reference to any invoice, transaction, or alleged agreement, and where the check was for a peculiar amount with no evident relation to the earlier invoice or contemplated settlement, cannot be a ratification of the alleged oral contract made by Puskaric, who had no authority to enter such an agreement. (Docket #487 at 9).

"A principal may subsequently ratify its agent's act, even if originally unauthorized, and such ratification relates back and supplies original authority." Banyan Corp. v. Schucklat Realty, Inc., 611 So. 2d 1281, 1282 (Fla. Dist. Ct. App. 1992). "[T]he issue of whether an agent's act has been ratified by the principal is a question of fact." Deutsche Credit Corp. v. Peninger, 603 So. 2d 57, 58-59 (Fla. Dist. Ct. App. 1992). "Ratification of an agreement occurs where a person expressly or impliedly adopts an act or contract entered into in his or her behalf by another without authority." Id. at 58. "An agreement is deemed ratified where the principal has full

knowledge of all material facts and circumstances relating to the unauthorized act or transaction at the time of the ratification." Id. "While ratification need not be expressed in words, there must be some intelligent act or conduct of the principal, 'made with full knowledge of the facts, which clearly shows an intention to be bound.'" Stalley v. Transitional Hosps. Corp. of Tampa, Inc., 44 So. 3d 627, 631 (Fla. Dist. Ct. App. 2010) (quoting Perper v. Edell, 35 So. 2d 387, 390 (Fla. 1948)). "Florida case law refers to acceptance of benefits to prove ratification where there is no proof of explicit ratification." Molinso Valle Del Cibao, C. por. A. v. Lama, 633 F.3d 1330, 1355 (11th Cir. 2011); see Spurrier v. United Bank, 359 So. 2d 908, 910 (Fla. Dist. Ct. App. 1978) ("Ratification, as applied to the law of agency, is the adoption or affirmance by a principal of the acts of his agent, either expressly, as by written act, or impliedly, as by acceptance of the benefits of the contract.").

As an initial matter, the undersigned finds that the issuance of the invoice is in no way a ratification of the alleged oral contract. The invoice was issued on October 3, 2011, four days prior to the alleged oral contract of October 7, 2011. A ratification must occur subsequent to the agent's action. Banyan Corp., 611 So. 2d at 1282.

However, the undersigned does find that there is a question of fact as to whether Accusoft's cashing of the check and its retention of those funds constitutes a ratification of the oral contract allegedly made by Puskaric, thereby making summary judgment inappropriate. See Molinso Valle, 633 F.3d at 1355; Spurrier, 359 So. 2d at 910. As stated above, while Accusoft asserts that it never accepted the payment, and only cashed the proffered check because it had a business practice of cashing all checks received, it never explains why it retained the funds or in what manner it held the funds. Nor is there unrefuted evidence in the record that would explain why Quest would tender such a sum to Accusoft if not for the purpose of a payment on the

alleged oral contract. Thus, I recommend that summary judgment be denied on Quest's counterclaims for breach of contract and anticipatory repudiation.

D. Promissory Estoppel

To state a claim for promissory estoppel, Quest must establish (1) that Quest detrimentally relied on a promise made by Accusoft, (2) that Accusoft reasonably should have expected the promise to induce reliance in the form of action or forbearance on the part of Quest, and (3) that injustice can be avoided only by enforcement of the promise against Accusoft. W.R. Townsend Contr., Inc. v. Jensen Civ. Constr., Inc., 728 So. 2d 297, 302 (Fla. Dist. Ct. App. 1999). Additionally, "Florida law requires more than mere reliance;" Quest must also show "reliance that causes a detrimental change of position." Pinnacle Port Cmty. Ass'n v. Orenstein, 872 F.2d 1536, 1543 (11th Cir. 1989).

Accusoft asserts that Quest's counterclaim for promissory estoppel, based on the alleged oral promise of Puskaric, must be dismissed as Quest cannot establish each of the required elements of the claim. (Docket #411 at 20). Accusoft argues that Quest has failed to provide evidence that it detrimentally relied on Puskaric's alleged promise. (Id.).

Florida appears to follow the "reliance measure" of damages for promissory estoppel claims. Devon Med., Inc. v. Ryvmed Med., Inc., 60 So. 3d 1125, 1131 (Fla. Dist. Ct. App. 2011). Under this approach, a party may recover only "the amount necessary to restore the injured party to the position it would have occupied had the promise not been made." Id. (quoting Creative Demos, Inc. v. Wal-Mart Stores, Inc., 142 F.3d 367, 369 (7th Cir. 1998)). Quest asserts the following as evidence of its detrimental reliance on the alleged oral contract: $24,444.50 paid to Accusoft in performing under the alleged contract, $70,000 to replace ImageGear with a third-party software product, and legal fees incurred in defense of this suit.

(Docket #464 at 12). Accusoft counters that Quest's claimed damages are not reliance damages. (Docket #487 at 10-11). While Accusoft is correct in its assertion that the legal fees that Quest has incurred in defending this suit and the costs of replacing ImageGear with a third-party software product are not reliance damages, Quest does not address the $24,444.50 payment by Quest to Accusoft. As addressed above, there is an issue of fact as to whether this payment was made in reliance on the alleged promise. Such a payment would act to the detriment of Quest.

Accusoft argues in the alternative that, even if Quest did detrimentally rely on Puskaric's promise, such reliance would have been unreasonable as a matter of law given, among other things, the parties' discussions, negotiations, and actions; Puskaric's lack of authority to bind Accusoft; and Accusoft's refusal to sign the 2011 Proposed License. (Docket #411 at 20-21).

Accusoft correctly states that, prior to October 7, 2011, Accusoft consistently maintained that any deal with Quest would be contingent on Accusoft also making a deal with MedPlus. However, according to Romeo, Puskaric, who had participated in prior negotiations along with Romeo, agreed orally on October 7, 2011 to the proposal to move forward with the Quest deal only and indicated that he would execute the Proposed 2011 License on behalf of Accusoft once Quest signed and emailed it to him. (Docket #411-7 at ¶ 7). While Accusoft attempts to question the credibility of Romeo's description of this telephone conversation with Puskaric, on this record the undersigned resolves all factual disputes in favor of Quest, the non-moving party. Hence, for purposes of this motion, I accept Romeo's account of the conversation – that Puskaric agreed that Accusoft would move forward with Quest and let the MedPlus/ChartMaxx agreement be a separate deal.

Accusoft argues that Puskaric did not have authority to bind Accusoft to an agreement with Quest. (Docket #411 at 16). Accusoft asserts that only Berlin, who was the putative and

listed signatory to the Proposed 2011 License, was authorized to close the deal. (Docket #487 at 8). Quest asserts that Accusoft provides no evidence that Puskaric lacked authority to enter into a contract on behalf of Accusoft. (Docket #464 at 10).

Puskaric has an ownership interest in Accusoft. (Docket #465 at 47-48). He was promoted to Vice President of Sales and Marketing for Accusoft in 2002 and still holds that office. (Docket #411-2 at 2; #465 at 39). As Vice President of Sales and Marketing, Puskaric manages the sales team and has more authority for negotiating than he would have as a sales manager. (Id. at 39). Puskaric is responsible for overseeing the licensing or sale of the ImageGear products. (Id.). While Accusoft has put forth evidence that Puskaric could not sign an agreement on behalf of Accusoft as he was not an officer of the company, and that agreements of this scope required Berlin's approval prior to signing, (Docket #411-8 at 4), there is evidence in the record that Puskaric represented to Romeo that he could make such agreements.

While the Proposed 2011 License's signature line for Accusoft still listed Berlin as the signatory, consistent with Romeo's characterization of the conversation, the Proposed 2011 License was executed by Quest and then emailed by Wagner to Puskaric for Puskaric's signature on October 27, 2011. (Docket #411-7 at 6). In the email, Wagner indicated that she was working to get the invoice paid promptly. (Docket #411-7 at 6). There is no indication that after receiving Wagner's email, Puskaric ever protested that he did not have the authority to make such an agreement on the behalf of Accusoft.

Puskaric's email to Bayliss of MedPlus after receiving the Proposed 2011 License executed by Quest is also instructive. Accusoft characterizes this email as stating that the only way Accusoft would enter into the otherwise agreeable license with Quest, would be if Accusoft also entered into an agreeable license with MedPlus contemporaneously. (Docket #411 at 7).

The undersigned does not read the email as requiring that interpretation. Instead, the email could just as equally be categorized as stating that an agreement had already been reached with Quest. (See Docket #37-2 at 2). In this email, Puskaric also unilaterally offered a discount of $8,000 on the annual rate to MedPlus, asking MedPlus to keep the communication confidential. (Id.). This email was not distributed by Puskaric to counsel for either party or to Berlin. This evidences that Puskaric had at least some authority to negotiate with respect to ImageGear unilaterally or at least held himself out as having such authority.

Accusoft also argues that any reliance by Quest would have been unreasonable as a matter of law due to Accusoft's refusal to sign the Proposed 2011 License. However, there is no indication that Quest was aware that Accusoft refused to sign the Proposed 2011 License prior to the date service of the suit was effected. Accusoft points to no evidence that Puskaric responded to Quest after receiving the Proposed 2011 License executed by Quest. As stated above, there is a question of material fact as to whether Berlin responded to Quest or to MedPlus only that the deal was "all or nothing." The next action taken by Accusoft with respect to Quest after receipt of the Proposed 2011 License executed by Quest was the filing of the present action on November 14, 2011. Two days after the commencement of the lawsuit, but two days before service was effected upon it, Quest sent the check to Accusoft. Hence, there is evidence that Quest acted in conformity with Romeo's account of his conversation with Puskaric.

There are material questions of fact as to the scope of Puskaric's authority and whether the making of the alleged oral agreement was included within the scope of that authority. See Citibank, N.A. v. Data Lease Fin. Corp., 828 F.2d 686, 691 (11th Cir. 1987) ("It is well settled under Florida law, that the existence of an agency relationship, the nature and extent of the agent's authority, and the inclusion within the scope of that authority of a particular act are

ordinarily questions to be determined by the jury or by the trier of facts in accordance with the evidence adduced in the particular case.") (quoting Fin. Fire & Cas. Co. v. Southmost Vegetable Co-Op. Ass'n, 212 So. 2d 69, 71 (Fla. Dist. Ct. App. 1968)). Further, the parties' course of negotiations and the fact that Accusoft did not sign the Proposed 2011 License does not require a finding that Quest's reliance on Puskaric's promise was unreasonable. Therefore, I recommend that summary judgment be denied on Quest's counterclaim of promissory estoppel.

E.      Affirmative Defenses

Accusoft asserts that it is entitled to summary judgment on Quest's second, third, sixth, tenth, and eleventh affirmative defenses to the extent those affirmative defenses are based on the counterclaims on which Accusoft seeks summary judgment. (Docket #411 at 21). For the same reasons that I have found that summary judgment is inappropriate with respect to the counterclaims, I recommend that summary judgment be denied as to these affirmative defenses.

IV.    CONCLUSION

For the foregoing reasons, I RECOMMEND that Accusoft's motion for summary judgment on certain of Quest's counterclaims and affirmative defenses (Docket #410) be DENIED. [10]

/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[10] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portions of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72(b)(2). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).