## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ACCUSOFT CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 12-cv-40007-TSH** |
| QUEST DIAGNOSTICS, INC., | ) | |
| and MEDPLUS, INC., | ) | |
| Defendants. | ) | |
| _____ | ) | |

## REPORT AND RECOMMENDATION
### (DOCKETS #412, #413, #417 and #425)

### August 19, 2015

Hennessy, M.J.

This civil action arises from dueling claims of copyright infringement and breach of

contract.  Jurisdiction of this court is based on diversity of citizenship, federal question, and 28

U.S.C. § 1338(a), respecting copyright claims.

Plaintiff Accusoft Corporation has moved for summary judgment in its favor on its

copyright and contract claims.[1]  (Dockets #417 and #425, respectively).  Accusoft's claims stem

from an allegation that the Defendants infringed and misused the "ImageGear License" – a

construct created by Accusoft based on a 2001 ImageGear software license agreement with

MedPlus, with subsequent 2003 and 2006 ImageGear deployment purchases by Defendants,

MedPlus, Inc.  Accusoft contends that the ImageGear License dictates how MedPlus could

install, use and distribute ImageGear.  On this underpinning, Accusoft claims that it learned in

August 2010 that MedPlus had violated the terms of the ImageGear License, by among other

---

[1]   The Amended Complaint and Answer and Counterclaims are found at Dockets #182 and #189, respectively.

things, distributing ImageGear by an unauthorized method, in failing to fully and accurately report the number of copies it had distributed, and in unilaterally transferring its right to use ImageGear to MedPlus's parent, Defendant Quest Diagnostics, Inc.  Accusoft contends that in addition to judgment on its copyright and contract claims, that Accusoft should also be awarded judgment on MedPlus's counterclaim for declaration of non-breach.

Defendants have cross-moved for summary judgment on the copyright and contract claims (Dockets #412 and #413, respectively), asking this court to find that Accusoft waived its copyright claims by entering into licensing agreements with MedPlus.  Defendants maintain that MedPlus's purchase of software in 2003 created a superseding agreement that licensed the Defendants' use and distribution of ImageGear.  For that reason, the Defendants contend that this court should deny Accusoft's motion for summary judgment, and instead, award summary judgment to Defendants based on Accusoft's failure to support its claims.

By order of reference (Docket #482), and pursuant to 28 U.S.C. § 636(b)(1)(B), this matter was referred to me for a Report and Recommendation on the parties' motions for summary judgment.  Plaintiff has moved for partial summary judgement in its favor on the following claims:  Count I (Breach of Contract v. MedPlus); Count II (Copyright Infringement v. MedPlus), Count III (Copyright Infringement v. Quest), Count IV (Secondary Copyright Infringement v. Quest); Counterclaim VI (Declaration of Non-Infringement by Quest), Counterclaim VII (Declaration of Non-Infringement by MedPlus); and Counterclaim VIII (Declaration of Non-Breach of Contract by MedPlus).  (Docket #189).  Defendants have cross-moved for partial summary judgment on Counts I - IV of the amended complaint.  Both parties filed opposition and reply memoranda and appeared before the court on July 13, 2015 and July 24, 2015 for oral argument.  These matters are now ripe for adjudication.

2

For the reasons that follow, I recommend that that all four motions (Dockets # 412, #413, #417, and #425) be denied.  Moreover, with respect to trial of this matter, and to the extent this assists the District Judge, I recommend that the Massachusetts Statute of Limitations, Mass. Gen Laws ch. 260, § 2, be applied to limit Accusoft's recovery for any breach that occurred, to six years before Accusoft filed its complaint.

## I.      BACKGROUND[2]

Plaintiff Accusoft is a Florida corporation in the business of creating, producing, selling, and distributing computer software that enhances imaging software solutions.  (Docket #461, ¶1).  In December 2008, Accusoft acquired the assets of a Delaware corporation named Accusoft Corporation ("Accusoft Delaware"), including certain rights to Accusoft Delaware's ownership of intellectual property in software known as ImageGear.[3]  (Docket #429-3).

ImageGear software has gone through many revisions since at least 1999, leading to multiple versions of the ImageGear product.  (Docket #414, ¶ 2).  For example, ImageGear has been released in versions 11, 12, 13, 14, and subsequent versions continuing through today.  (Docket #523, ¶ 6).  Accusoft Delaware obtained copyright registrations for "IMAGEGEAR 2001," "ImageGear Professional Edition v.13," "ImageGear Professional Edition v.14," and

---

[2]   The following recitation of facts is assumed as true only for purposes of the instant motion.  It is drawn from the statements of fact submitted by both parties, unless otherwise noted.  The hundreds of docket entries in this case are complex, as many of the filings are made under seal.  To present the material facts in the most straightforward manner, some of the facts are introduced, not in this Background section, but instead in the Analysis section below.  Whenever facts are introduced, there are citations to docket entries.  If facts are disputed, they are noted, and when possible, I resolve the dispute.

[3]   In December 2008, at the time of the asset purchase, Plaintiff was known as PIC ACQUISITION II, Inc.  After the purchase of ImageGear and other assets, PIC changed its name to Accusoft Corporation, the entity that is the plaintiff in this lawsuit.  (Docket #461, ¶ 2).

"ImageGear Professional Edition v.16."  (Docket #414, ¶¶ 3, 7).  Accusoft refers to

"IMAGEGEAR 2001" as ImageGear Version 11.  (Docket #447, ¶ 3).

ImageGear is a software development toolkit that allows software developers to

implement discrete imaging functionality into a software product.  (Docket #461, ¶ 3).  Accusoft

licenses ImageGear for both "Development" and for "Distribution."  (Id., ¶ 5).  Accusoft's usual

practice was to first license a software development kit to its customers for development of the

customer's product or application.  (Id., ¶ 6).  If incorporation was successful, the customer

would then seek permission from Accusoft to distribute ImageGear in the product or application,

to third parties.  (Id., ¶ 7).

Defendant MedPlus, Inc., is a developer and integrator of clinical connectivity and data

management solutions.  (Docket #414, ¶ 8).  Defendant Quest Diagnostics, Inc., provides

diagnostic testing information services and diagnostic solutions.  (Id., ¶ 9).  On or about

November 1, 2001, Quest acquired control of MedPlus and continues to own and control

MedPlus as a wholly owned subsidiary of Quest Diagnostics.  (Docket #182, ¶ 11).  MedPlus

developed several software products called ChartMaxx, eMaxx and OptiMaxx.  (Docket #414, ¶

23).  ChartMaxx is a software product that allows end-users (typically hospitals) to store

electronic medical records of patients so that those records can be accessed and used by hospital

personnel.  (Id., ¶ 24).  eMaxx is an application service provider ("ASP") that allows end-users to

electronically order laboratory tests from a Quest laboratory, and then to receive those test results

from the laboratory in electronic form.  (Id., ¶ 26).  OptiMaxx has similar functionality to

ChartMaxx and allows patient medical records to be stored electronically.  (Id., ¶ 25).  In March

2008, the six MedPlus employees who maintained the OptiMaxx program for MedPlus, became

Quest employees and continued to perform the same duties regarding OptiMaxx that they had performed as MedPlus employees for Quest.  (Docket #461, ¶ 14).

A.  <u>MedPlus Purchases of ImageGear</u>

On November 26, 2001, Accusoft and MedPlus entered into a software licensing agreement covering the use of ImageGear Version 11 into ChartMaxx and eMaxx.  (Docket #182-1; #414, ¶ 27).  Among other things, the non-exclusive, non-transferable license agreement gave MedPlus the right to incorporate ImageGear Version 11 into ChartMaxx and eMaxx products through two software development kits ("SDKs"), as well as to distribute 4,500 "Concurrent User" licenses.  (<u>Id.</u>).  Pursuant to the agreement, MedPlus paid Accusoft $90,000.  (<u>Id.</u>, ¶ 28).  MedPlus included ImageGear Version 11 into ChartMaxx versions 3.2, 3.3, and 3.31.  (Docket #414, ¶¶ 35-37).  Accusoft contends this is the "master" agreement governing all of MedPlus's future uses of ImageGear (Docket #426, p.5); Defendants allege that the 2001 Agreement is limited to the terms outlined therein, and that the parties reached a subsequent, superseding agreement in 2003 (Docket #498, ¶ 1).

In November 2003, MedPlus ordered 5,000 licenses of ImageGear Version 13 from Accusoft.  (Docket #182-2, p.2).  The "Product" identified on the Order Form was "ImageGear v13."  (Docket #182-2).  MedPlus paid the $50,000 set forth on the Order Form.  (Docket #414, ¶ 61).  Defendants contend that the purchase was part of a new software license agreement that expanded both the development and distribution methods from those outlined in the 2001 Agreement (Docket #414-1, ¶¶ 54-55); Accusoft contends this was merely a purchase of software licenses, subject to the terms of the 2001 Agreement.  (Docket #471, ¶ 52).

Starting in 2005, MedPlus began incorporating ImageGear Version 14 into OptiMaxx.  (Docket #461, ¶ 13).  On or about December 7, 2006, Accusoft generated an Order Form for

5,000 "ImageGear Professional v14 runtime licenses.  ImageGear Functionality, on any

platform, for Concurrent User deployment seats."  Id.  The Order Form reflected the price of

$47,500.  Accusoft's Order Form called for authorized signatures by Accusoft and "Customer,"

including the title and printed name of the signatories.  Id.  Accusoft's Order Form is signed for

Accusoft by David Breitbart Frischling, whose title is Vice President and General Counsel, and

for "Customer," MedPlus, by "Candace Levine, Vice President Finance/Controller."  Id.  The

Order Form provides in relevant part:

> The signature below indicates the Customer's acceptance of … (2) the
> terms and conditions of the Software License Agreement located in the
> "Help" dialog box that accompanies the product.

Id.  The Order Form appears attached at Exhibit C to the Amended Complaint.  (Docket #182-3).

Following the Order Form at Exhibit C, is a printed Software License Agreement.  (Id.).

Accusoft alleges in the amended complaint that the documents comprising Exhibit C are "a true

and correct copy of documentation" relating to the 2006 purchase of 5,000 additional distribution

licenses.  (Docket #182, ¶ 17).  The Software License Agreement included with Exhibit C is

undated, unsigned and wholly lacking in indicia that it is the Software License Agreement

referenced in the Order Form.  (Docket #182-3).  It does expressly cross-reference an Order

Form as identifying the product, quantity, fees and term of the Agreement, see e.g., Exhibit C,

Software License Agreement, Article 1, Section 1.12; however, it does not expressly identify the

December 7, 2006 Order Form executed by the parties.  (Id.).  At oral argument on July 24,

2015, Defendants argued for the first time that Accusoft has failed to offer evidence the Software

License Agreement included with Exhibit C is the agreement governing MedPlus's purchase in

2006.  (Docket #553, pp. 23-28).  Accusoft and Defendants characterize this purchase as just that

– a purchase of licenses that is not subject to a new agreement in 2006.

B.  Procedural History

Shortly after filing the complaint in Florida in 2011, Accusoft stipulated to the transfer of venue to this court in January 2012.  (Docket #20).  Later that month, Accusoft moved for a preliminary injunction regarding the Defendants' unlicensed use and distribution of ImageGear, focusing on the Defendants' use and distribution of ImageGear in OptiMaxx.  (Docket #28). Accusoft argued that the 2001 Agreement governed the parties' licensing relationship, and that because the 2001 Agreement limited MedPlus's ability to incorporate ImageGear into only ChartMaxx and eMaxx, any use in OptiMaxx breached the 2001 Agreement and infringed Accusoft's copyright.  (Id.).  Accusoft did not raise the issue of the 2003 and 2006 purchases (id.), and neither did Defendants (Docket #36).

As District Judge Saylor noted in his decision on Accusoft's motion for a preliminary injunction:

> Defendants do not contest the validity of plaintiff's copyright.  Nor do they contest that, between November 2001 and November 2011, they incorporated ImageGear into ChartMaxx and OptiMaxx and distributed the product for use at Quest facilities as well as by third-party customers. Thus, the sole question is whether defendants' actions amounted to unlicensed infringement.

(Docket #53, p. 12).  Judge Saylor answered in the affirmative and entered an injunction that barred the Defendants from expanding its use of ImageGear in any product other than ChartMaxx and eMaxx, to new customers.  (Docket #54).

Through discovery, the factual record has been significantly developed since April 2012 when the injunction issued.

## II.    LEGAL STANDARD

Summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotations omitted).  "A fact is 'material' if it carries with it the potential to affect the outcome of the suit under the applicable law."  Id.  "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position."  Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).  "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."  Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006).  The trial judge has an "affirmative obligation" to "prevent 'factually unsupported claims or defenses' from proceeding to trial."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)).  When reviewing the evidence through the summary judgment prism, the court must make all justifiable inferences in the light most favorable to the non-moving party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999); see also Fed. R. Civ. P. 56(c).  If the First Circuit has ruled on an issue, this Court owes deference to that ruling.  Eulitt v. Maine Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004); Sarzen v. Gaughan, 489 F.2d 1076, 1082 (1st Cir. 1973).

III.    ANALYSIS

As a preliminary matter, I draw certain conclusions which significantly change the record and assumptions on which the parties base their summary judgment arguments.  In particular, whereas Accusoft grounds its summary judgment arguments on the allegation that there is only one software licensing agreement between the parties, executed in 2001 that Accusoft characterizes as a "master" contract, I find that allegation ignores persuasive evidence of an agreement in 2003, titled "Software License Agreement," and duly executed by authorized representatives of the parties.  The existence of the 2003 agreement marginalizes positions Accusoft takes.  Similarly, Defendants ground their arguments on the premise that there were agreements in 2001 and 2003, but not in 2006.  These arguments ignore persuasive evidence of a 2006 software licensing agreement referred to in an order form (which Defendants acknowledge, but cast as a mere purchase order).  This evidence affects their summary judgment arguments.  Finally, beyond the impact on the parties' arguments, my conclusions have practical effects which are discussed below.  In the following discussion, I find that there were three software licensing agreements that govern MedPlus's use of different versions of ImageGear.

A.  The Three Agreements

1.  The 2001 License Agreement

One of the only material facts that is undisputed between the parties is the existence of a 2001 Software Licensing Agreement.  The agreement is attached to the amended complaint and its terms speak for themselves.  The 2001 Agreement addressed MedPlus's licensing of ImageGear Version 11.  On its face, the agreement in its most general terms provides that MedPlus could incorporate ImageGear Version 11 into ChartMaxx and eMaxx, and distribute

those applications to up to 5,000 concurrent users.  The parties dispute whether certain acts amount to infringement or breaches of contract, but those arguments are addressed <u>infra</u> at Point D of this report and recommendation.

     2.   The 2003 Agreement

     The existence and implication of a software licensing agreement in 2003 is contested; for the reasons that follow, I find that the 2003 documents demonstrate that the parties formed a contract once Accusoft's representative signed the Order Form and initialed each page of the attached software licensing agreement.

     In the absence of fraud, assent to the terms of a contract can be manifested in a number of ways, but signing or initialing a written document has always been considered the hallmark of assent.  <u>Bose Corp. v. Ejaz</u>, No. 11-CV-10629-DJC, 2012 WL 4052861, at *4 (D. Mass. Sept. 13, 2012) (citing <u>DeLuca v. Bear Stearns & Co.</u>, 175 F. Supp. 2d 102, 115-16 (D. Mass. 2001)). Accusoft's 2003 Order Form called for authorized signatures by Accusoft and "Customer," including the title and printed name of the signatories.  (Docket #182-2).  Accusoft's Order Form is signed for Accusoft by David Breitbart Frischling, whose title is Vice President and General Counsel, and for "Customer," MedPlus, by "Marla Kouche, VP Finance."  (<u>Id.</u>).  The November 17, 2003 Accusoft Order Form includes a statement:  "[t]he signature below indicates the Customer's acceptance of … (2) the terms and conditions of the Software License Agreement located in the "Help" dialog box that accompanies the product."  (<u>Id.</u>).  The Order Form was faxed with the attached Accusoft Software License Agreement.  (<u>Id.</u>).  There is a fax banner from MedPlus that appears at the top of the 2003 documents, and it reflects that MedPlus faxed the Order Form and Software License Agreement in uninterrupted sequence.  (<u>Id.</u>).  Accusoft received the documents with the handwritten notations, which reflected terms that the parties had

negotiated.  Moreover, the Software License Agreement states that it "includes this Agreement's terms and conditions, Order Forms, Schedules, Exhibits Addenda, and Amendments, if any, which are incorporated in, and form an integral part of, this Agreement."  (Id., Section 1.1). There were no Schedules, Exhibits, Addenda, or Amendments; so, the Agreement comprises its own terms and conditions plus those on the Order Form.

These documents contain the essential elements of a contract. Jacobson v. Perman, 238 Mass. 445, 448 (1921) (holding the essential elements of a contract include a description of the item, the quantity to be sold, the price to be paid, the terms of payment, and the time of delivery). The Accusoft Order Form identifies the customer (MedPlus), describes the product ("ImageGear Professional v.13 runtime license – ImageGear functionality, on any platform, for Concurrent User deployment seats"), the quantity (5,000 units), the unit price ($10.00), and the total price ($50,000.00).  (Docket #182-2).

The 2003 Agreement is different than the 2001 Agreement in ways important to the parties' dispute in this litigation.  Among other things, the 2003 Agreement permits MedPlus to distribute ImageGear Version 13 by more than the "concurrent user" method; it also permits distribution by "client/server" and "site license" methods.  (Id.).  This is memorialized in two ways.  First, in the agreement itself are new definitions of "site license," and "client/server." (Id., Section 1.8(e)).  Second, the Order Form includes handwritten language which would be obvious to anyone signing the contract (as opposed to language buried in boilerplate of an agreement) that expressly states "Distribution Methods may include client /server and or concurrent user + site license."  (Docket #182-2) (emphasis in original).

Accusoft argues that the handwritten comments on the Order Form expanding the distribution methods to include client/server and site licenses are not binding and were never

contemplated by the parties.  There are two flaws in this argument.  First, it ignores the language at Section 1.8 of the 2003 Agreement which provides that "Distribution Method may include" client/server and site distribution methods.  Second the parties' communications in the weeks before finalizing the 2003 Agreement reflect the very opposite of Accusoft's argument.  For example, on November 6, 2003, as the parties were discussing MedPlus's purchase of version 13, Accusoft's salesperson Brendan Day, emailed MedPlus's Ray Mazza, stating that one of Accusoft's "'to-dos' from yesterday's Con Call … [include] Software License Agreement for version 13 of ImageGear – Attached … Tomorrow's call will cover … Need for Site Licenses – How is this addressed in the contract you present to your customer; Software License Agreement Questions …."  (Docket #429-6, pp. 4-5).  An email weeks later from Attorney Frischling to Mr. Mazza states:  "Attached please find my revisions for the contact [sic] … Section 1.8 – I added a definition for Site license as we discussed …."  (Id., p.3).  Apart from Accusoft's own communications, the testimony of Attorney Frischling reflects the negotiation of expanded distribution methods into the 2003 Agreement.  Attorney Frischling testified that if a customer wanted to negotiate the software license agreement, the sales representative would first work out the quantity and cost, and then Mr. Frischling would start editing the template.  (Docket #429-7, p. 349).  He remembered that the Order Form was presented with the draft software licensing agreement.  (Id., p. 350).  The 2003 Agreement contains a footer that says "Copyright Accusoft Corporation, 2003, All Rights Reserved, Proprietary & Confidential, Page 1 of 5, Amended." (Docket #182-2, p. 4).  Attorney Frischling testified that "amended" means that he must have changed the standard template.  (Docket #429-7, pp. 351-352).  He also believes that the term "site license" was an amended term, not found in the standard template.  (Id., p. 354).  Attorney Frischling also acknowledged that his initials appear on each page in the 2003 agreement.  (Id.,

p. 355).  This record reflects Accusoft's participation in negotiating the 2003 Agreement, and its

awareness – through its General Counsel no less – that site licenses were granted to MedPlus.

Accusoft advances three arguments, none of which are persuasive to this court, as to why

the 2003 documents do not amount to a binding license agreement.  First, Accusoft attempts to

cast doubt on Mr. Mazza's authority to sign license agreements, highlighting his deposition

testimony that in 2003, he needed final approval from Marla Kouche; however, Ms. Kouche, and

not Mr. Mazza, signed the 2003 Order Form (which references and attaches the 2003 Software

License Agreement).  (Docket #182-2).  Moreover, Mr. Mazza also testified that he was

authorized to make amendments to contracts.  (Docket #476-2, pp.74-75).

Second, Accusoft argues that the 2003 purchase documents lack key components that

were in the 2001 License Agreement, and that are necessary to create a binding contract,

including a Distribution License Agreement (the face page of the 2001 Agreement), a signature

page, and identification of the MedPlus applications into which ImageGear could be

incorporated.  This argument ignores the 2003 documents.  The definition of "Agreement" found

at Section 1.1 of both license agreements (Dockets #182-1, 182-2), changed from the 2001

Agreement to the 2003 Agreement, so that the 2003 Agreement deletes any reference to a face

page; the fact that one is absent in 2003 is therefore inconsequential.[4]  Likewise, the formatting

of the 2003 Order Form and Software License Agreement changed so that there is no separate

signature page to the 2003 Agreement; rather the signature lines appear only on the Order Form,

which expressly incorporates the 2003 Agreement.  Moreover, each page of the 2003 Agreement

---

[4]   In the 2001 Agreement, the definition provided: "'Agreement' means this Agreement, which
includes the face page, terms and conditions, and Schedules and Exhibits … ."  (Docket #182-1,
Section 1.1).  In the 2003 Agreement, the definition provided: "'Agreement' means this Software
License Agreement, which includes this Agreement's terms and conditions, Order Forms,
Schedules …."  (Docket #182-2, Section 1.1.).

is initialed by Attorney Frischling. Thus, the absence of a signature page in the same format as the 2001 Agreement is also of no concern. The change in the definition of "Application" between 2001 and 2003 obviates the need to specify those applications that MedPlus intended to develop using ImageGear. The definition of Application changed from that "identified on the face page" (2001), to any that were "developed by Licensee" (2003). The pricing is evident on the Order Form in 2003, so the fact that it appears in a different place is inconsequential.

Lastly, Accusoft argues that the 2003 documents are not an agreement on the basis of testimony from Jennifer Marshall, MedPlus's Rule 30(b)(6) designee with respect to licensing matters. When first deposed in 2012, Ms. Marshall testified that she had no knowledge of a 2003 license agreement and she thought the 2001 agreement was the governing agreement (Docket #476-2, p. 49); however, in preparing for her deposition in this litigation, she realized there was an agreement in 2003. (Id., p. 56). Ms. Marshall's failure to independently recollect the 2003 Agreement cannot be squared with the record in this case which shows a writing, on Accusoft's own letterhead, signed and initialed by Accusoft's General Counsel, expressly providing that the customer's signature indicates acceptance of the 2003 Agreement. (Docket #182-2).

For the foregoing reasons, I find as a matter of law that the 2003 documents constitute a valid, binding license agreement that governs the terms of MedPlus's use of ImageGear Version 13. See Bank v. Int'l Bus. Mach. Corp., 145 F.3d 420, 423-24 (1st Cir. 1998) (if a court finds the contract language is unambiguous, it must interpret it according to its plain terms). I also find that the 2003 Agreement permits distribution by client/server, concurrent user, and site license methods. Those terms are all defined in Section 1.8 of the Agreement. (Docket #182-2). Finally, I find that the 2003 Agreement permits MedPlus to incorporate and distribute (by the

methods listed above) ImageGear Version 13 into any software applications developed by MedPlus.  (Docket #182-2, Sections 1.2, 1.13, 2.2, and 2.3).

    3.  The 2006 Agreement

    I find that Accusoft and MedPlus entered into a Software License Agreement in December 2006 despite neither party having endorsed this view.  Accusoft has maintained that the 2001 Agreement was intended by the parties to be a "master" agreement to which all subsequent purchases of distribution licenses were subject, and Defendants have asserted the 2003 Agreement became the "new master" agreement after it was signed.  The discussion above disposes of the parties' characterizations of either agreement as the master.  Instead, each of those agreements addressed licensing of a specific version of ImageGear (versions 11 and 13, respectively).  I turn then, to the events of December 2006 to determine whether there was a separate agreement that governed MedPlus's purchase of 5,000 distribution licenses of ImageGear Version 14.

    The record shows that MedPlus sent a purchase order to Accusoft dated December 7, 2006 for ImageGear 2001 Active X Developer, noting a total price of $47,500.  (Docket #182-3).  Accusoft generated an invoice dated December 8, 2008, for 5,000 "IG Pro v14 lic.. Img., on any platform, Concurrent sea[ts]."  (Id.).  Accusoft also generated an Order Form, dated December 7, 2006 for 5,000 "ImageGear Professional v14 runtime licenses. ImageGear Functionality, on any platform, for Concurrent User deployment seats."  (Id.).  The Order Form reflected the price of $47,500.  (Id.).  Accusoft's Order Form called for authorized signatures by Accusoft and "Customer," including the title and printed name of the signatories.  (Id.).  Accusoft's Order Form is signed by Frischling, Accusoft's Vice President and General Counsel, and for

"Customer," MedPlus, by "Candace Levine, Vice President Finance/Controller."  (Id.).  The

Order Form provides in relevant part:

> The signature below indicates the Customer's acceptance of … (2) the
> terms and conditions of the Software License Agreement located in the
> "Help" dialog box that accompanies the product.

Id. (capitalization and quotation marks in original).

Also included with the Order Form attached as Exhibit C to the Amended Complaint, is a

printed Software License Agreement.  (Docket #182-3).  Accusoft alleges in the amended

complaint that the documents comprising Exhibit C are "a true and correct copy of

documentation" relating to the 2006 purchase of 5,000 distribution licenses of Version 14.

(Docket #182, ¶ 17).  The Software License Agreement included with Exhibit C is undated,

unsigned and lacking in indicia that it is the Software License Agreement referenced in the Order

Form.  (Docket #182-3).  It does expressly cross-reference an order form as identifying the

product, quantity, fees and term of the Agreement (e.g., id., Section 1.12); however, it does not

expressly identify the December 7, 2006 Order Form executed by the parties as the Agreement.

Defendants argue that Accusoft has failed to authenticate the Software License

Agreement attached at Exhibit C to the Amended Complaint, and therefore has missed the

opportunity to prove both the terms and conditions of the agreement and breach of such terms

and conditions; I reject this argument.  Courts may reject arguments raised for the first time in a

reply by the party who is seeking a dispositive ruling.  See NExTT Solutions, LLC v. XOS

Techs., Inc., No. 15-10562-NMG, 2015 WL 4128255, at *5 (D. Mass. July 9, 2015) (holding that

defendant's argument in support of its motion raised for first time in its reply brief was waived,

although it could be appropriately raised in a future dispositive motion).  Here, Defendants did

not raise an objection to authenticity until oral argument on July 24, 2015, after a full

development of the record and full briefing (Docket #553, pp. 23-28); thus, I reject this argument.

Accusoft has offered to file a declaration authenticating the Software Licensing Agreement attached to the 2006 Order Form (Docket #553, p. 44); however, I find that allowing Accusoft to do so may generate more litigation than it resolves.  Defendants may object to Accusoft being given such opportunity, to the content of the declaration or the qualifications of the declarant.  Moreover, allowing Accusoft to file such a declaration would not resolve issues that I recommend below be decided by a jury at trial, for instance, the meaning of the term "concurrent user," or other factual issues that would survive Accusoft authenticating the terms and conditions of the 2006 Software License Agreement.  I recommend that given Defendants' failure to raise the question of authentication in any summary judgment filing, Accusoft should be permitted at trial to prove the terms and conditions of the 2006 Software License Agreement, and whether Defendants have breached that agreement.

I therefore find that the December 7, 2006 Order Form was executed by duly authorized representatives of Accusoft and MedPlus.  I find that by signing this Order Form both Accusoft and MedPlus agreed that the parties' dealings with regard to the 5,000 distribution licenses for ImageGear Professional Version 14 were subject to the terms and conditions of a Software License Agreement that could be generated by accessing the "Help" dialog box that Accusoft provided with the product, as unambiguously stated on the executed Order Form.  However, without the licensing agreement before the court, I cannot as a matter of law, interpret its terms.

Having established that the parties entered into three different software licensing agreements, I turn to interpreting the authenticated agreements against Accusoft's claims of breach.

B.  Is Accusoft entitled to Summary Judgment on Claims of Breach of License Agreements?

In its motion, Accusoft seeks summary judgment on Count I and Counterclaim VIII, alleging that MedPlus breached the "ImageGear License" (a construct the complaint defined, but rejected by me in the preceding discussion), "by distributing ImageGear in numbers exceeding the licenses purchased and by Distribution Methods contrary to the terms of that license."[5] (Docket #425).  I find that disputes of fact over terms in the agreements preclude me from making findings of breach as a matter of law.

1.  The determination whether MedPlus exceeded the number of distribution licenses depends on the meaning of the term "concurrent user."

Foremost, the meaning of "concurrent user" is relevant to the agreements and is central to resolution of breach of license agreement claims raised in the motions for summary judgment. Defendants argue that "concurrent user" is unambiguous and establishes that Accusoft cannot prove distribution of ImageGear in excess of the 14,500 distribution licenses Accusoft sold to Defendants in 2001, 2003, and 2006.  Accusoft interprets the term differently than Defendants, argues that the term is unambiguous, and contends that Defendants cannot escape that they exceeded the authorized number of distributions in this case by some 825,000 distributions.

At the outset, the fact that parties to litigation attribute different meanings to a contract term does not establish ambiguity in the contract.  Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004).  However, in considering the language used, I believe the term "concurrent user," as defined in the parties' agreements, is ambiguous, precluding summary judgment and creating a question

---

[5]  Defendants have cross-moved for summary judgment on Count I.  (Docket #413).

of fact for the jury.  Both the 2001 and 2003 Distribution License Agreements define "concurrent

user" as follows:

> "Concurrent User" means the End User is permitted to have a fixed number of individual users who are authorized to use one copy of the Application[6] on a single person computer or a single networked computer at the same time.

(Dockets #182-1, Section 1.7(b); #182-2, Section 1.8(b)).  Massachusetts law governs my

interpretation of the contract.  (Dockets #182-1, Section 10.6; #182-2, Section 10.6).

Under Massachusetts law, "[t]he meaning of an unambiguous contract term is a question

of law, while the meaning of an ambiguous contract term is a question of fact."  Farmer's Ins.

Exch. v. RNK, Inc., 632 F.3d 777, 783-84 (1st Cir. 2011) (citations omitted); see also Nicolaci,

387 F.3d at 26 (contract interpretation is a question of law for the court unless the contract is

ambiguous).  An unambiguous contract is interpreted according to its plain terms.  Bank, 145

F.3d at 424 (citing Den Norske Bank AS v. First Nat'l Bank of Bos., 75 F.3d 49, 52 (1st Cir.

1996)).  If the plain terms unambiguously favor either side, summary judgment is appropriate.

Bank, 145 F.3d at 424.  "On the other hand, if the contract's terms are ambiguous, contract

meaning ordinarily becomes a matter for the factfinder, and summary judgment is appropriate

only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that

no reasonable person could decide to the contrary."  Farmer's Ins. Exch., 632 F.3d at 784

(quoting Bank, 145 F.3d at 424).  A "contract is only ambiguous 'where an agreement's term are

inconsistent on their face or where the phraseology can support reasonable differences of opinion

as to the meaning of the words employed and the obligations undertaken.'"  Bank, 145 F.3d at

---

[6] "Application" is also a defined term and refers to a software product MedPlus developed that contained ImageGear.  (Dockets #182-1, Section 1.2; #182-2, Section 1.2)
.

424 (quoting <u>Coll v. PB Diagnostic Sys., Inc.,</u> 50 F.3d 1115, 1122 (1st Cir. 1995)).  "Where

possible, words should be given their natural meaning, consistent with the tenor of contractual

terms."  <u>Fashion House, Inc. v. K Mart Corp.,</u> 892 F.2d 1076, 1084 (1st Cir. 1989) (citations

omitted).

Here, Accusoft focuses on the language "a fixed number of individual users who are

authorized to use one copy of the Application."  It argues that such language unambiguously

contemplates the designation of authorized individuals who can use the Application containing

ImageGear.  It is that number that is "fixed," and does not permit the substitution of other

individuals.  As this court understands Accusoft's position, if a MedPlus customer, say a

hospital, wanted to have four individuals on each of the three eight-hour shifts of the twenty-

four-hour work day to be authorized to use the Application containing ImageGear, then MedPlus

must distribute, and report to Accusoft, twelve concurrent user licenses, four for each of the three

shifts.  According to Accusoft's position, all twelve individuals could use a single license

concurrently.

This interpretation is certainly plausible, and it has the virtue of recognizing the

possibility that during a shift change or adjustments in fixed eight-hour schedules, any number

up to 12 of the authorized individual users might be at work at the same time and use the

Application.  One problem with this interpretation is that the definition of "concurrent user"

immediately follows the definition of "single user" in the 2001 Distribution License Agreement

and immediately proceeds the definition of "named user" in the 2003 Software License

Agreement.  The definitions of single user and named user are identical:

> [T]he End User is permitted to have only one single, named individual user
> who is authorized to use one Copy of the Application on a single personal
> computer.

(Dockets #182-1, Section 1.7(a); #182-2, Section 1.8(c)).

The language of these definitions and their proximity to the term "concurrent user," is illuminating.  See Town of Pembroke v. Silver Lake Regional School District, No. 14-P-1239, 2015 WL 4528771, at *2 (Mass. App. Ct. 2015) (stating a "contract is to be construed as a whole") (quoting Murray v. Edges Mfg. Co., 309 Mass. 395, 401 (1941)).  In my view, they show that if Accusoft intended to limit concurrent users to authorized individuals, it could have used wording similar to the definitions of single user and named user.  In other words, had Accusoft inserted the word "named" or "single" before the word "individual" in the definition of "concurrent user," Accusoft could have more clearly conveyed the meaning it now assigns to "concurrent user."  The failure to do so raises questions about the meaning of the term.  Accusoft's assigned meaning, of course, benefits Accusoft's bottom line by requiring that MedPlus buy more concurrent user licenses for distribution to MedPlus customers.

MedPlus focuses on the language "at the same time."  It argues persuasively that Accusoft's interpretation renders the phrase "at the same time" meaningless, because under Accusoft's interpretation, the number of authorized individuals is fixed, and would never exceed the number who could use the Application "at the same time."  Rather, because such individual users are authorized, that is the end of the inquiry.  In arguing for this interpretation, MedPlus cites to and relies on a basic tenet of contract interpretation:  that a contract should be interpreted in a manner which avoids rendering words meaningless.  In MedPlus's view, the interpretation that avoids this result is that "concurrent user" means simultaneous user and allows for substitution of individual authorized users.  Returning to this court's example, if the hospital wanted four users on each of the three eight-hour shifts to be authorized to use the Application with ImageGear, MedPlus would sell, and need report to Accusoft, four, rather than twelve,

concurrent licenses.  If during the shift change, more than four -- say six -- users wanted to use

the Application, the last two users to attempt to access the Application would be blocked.  Four

would be authorized to use the Application "at the same time."  This interpretation benefits

MedPlus by enabling it to market its application as maximizing the resources available to its

customers and minimizing the cost of those resources.

      I find that MedPlus's interpretation is also reasonable but not without some internal

tension.  First, it tends to violate the very tenet MedPlus invokes because the word "authorized"

becomes nearly meaningless.  I suppose "authorized" could mean those individuals -- say

hospital employees -- who are trained to use the Application and permitted, by virtue of their

jobs, to access patient information through the Application.  In other words, a custodian or

parking valet would not be authorized.  However, it is not clear why Accusoft would care about

these types of internal management policies at a customer of MedPlus; Accusoft is in the

business of making money, not, for example, enforcing HIPPA regulations.  Second, MedPlus'

interpretation of "concurrent user" seems to connote "installations" of the Application and not

"individual users."  This is not an implausible interpretation, but it does not square easily with

the use of the word "who" in the definition, which suggests a person and not a work site or

computer.

      The foregoing analysis leads me to conclude that the term "concurrent user" is

ambiguous and warrants fact-finding to decide the meaning of the term.  I therefore turn to the

second part of the summary judgment analysis:  whether the extrinsic evidence presented about

the parties' intended meaning is so one-sided that no reasonable person could decide to the

contrary.  Farmer's Ins. Exch., 632 F.3d at 784.  I find that the record lacks sufficient extrinsic

evidence about the parties' intended meaning of the term to resolve any ambiguity.  Each party

asserts that its own interpretation is the only reasonable interpretation.  Defendants point to dictionary definitions to support their interpretation, however, Accusoft has moved to strike those definitions (which I would be inclined to grant), and in any event, I find that reliance on dictionary definitions would not render the extrinsic evidence so one-sided as to warrant summary judgment.  Similarly, as noted in the discussion <u>infra</u> on the statute of limitations, Accusoft's predecessor was lax in its right to conduct audits of MedPlus and ensure compliance with the terms of the agreements it made.  By sleeping on its rights, Accusoft missed the opportunity to detect distribution inconsistent with its interpretation and to create a record of extrinsic evidence that could be assessed on a motion for summary judgment.  Extrinsic evidence, to the extent it exists, does not so favor one side or the other.  Therefore, summary judgment is not appropriate.

      2.   The determination of whether MedPlus's distribution methods breached the 2001 Agreement

Accusoft moves for summary judgment on the basis of the separate claim that MedPlus breached the 2001 Agreement by distributing eMaxx and ChartMaxx via a server method.[7] There are two predicates for this claim.

First, Accusoft alleges that "multiple server deployments were made of applications containing ImageGear … [and that Defendants] admitted that ChartMaxx was delivered to and accessed by users via a server rather than by individual machines."  (Docket #426, p. 9 (citing deposition testimony)).  A review of the cited testimony does little to support Accusoft's

---

[7]  I do not address whether such conduct would violate the 2003 and 2006 Software License Agreements because Accusoft, contending that the 2001 Agreement was the one and only "master" agreement, and that the 2003 and 2006 agreements were not agreements at all, does not assert such a claim.

allegation.  Much of the testimony refers to "site," and not "server," licenses.  It may be that a

"site" license is executed by a "server" installation, but that inference is not sufficiently

supported.  Every cited witness testifies to a "belief," and fails to provide anything more than, at

best, a partially informed understanding about how software was installed or billed.  (Id.).

Examining counsel also use the terms "site" and "server" indiscriminately.  (Id.).  Finally,

Accusoft offers no evidence that the conduct that is the subject of this testimony is within the six

year statute of limitations for breach of contract and the citations are without any time frame.[8]  In

sum, the cited record fails to support the motion for summary judgment as to this predicate of the

claim.

     The second type of unlicensed distribution alleged involves the interaction of eMaxx and

ChartMaxx when an end user of eMaxx makes a discrete printing request.  Perhaps the best

description of this claim is from Defendants.  During discovery, the court ordered the Defendants

to "state how and to what extent ImageGear was used in each product."  (Docket #297).  In

response, with respect to eMaxx, Defendants reported:

> eMaxx was a software application previously offered to certain customers
> of Defendants, typically physicians.  eMaxx was installed on MedPlus
> servers in the MedPlus Cincinnati Data Center.  eMaxx was never
> installed at customer sites.  eMaxx was an "ASP"[9] that allowed Quest
> Diagnostics' laboratories to communicate test results directly to physicians
> through a web interface.  After results were communicated to physicians,
> they could view and print the test results.
>
> There was never any ImageGear SDK used in developing eMaxx and
> eMaxx end users were never provided a copy of ImageGear.  The only use
> of ImageGear by an eMaxx customer would occur if that eMaxx customer
> needed to print a subset of pages of one document, i.e., only certain pages

---

[8]   The statute of limitations is discussed in the final section of this report and recommendation.

[9]   "ASP" stands for Application Service Provider; an ASP hosts software applications within its
own facilities, and customers access the application over the Internet.

of a multiple page lab result.  In that case, the print request would be routed to a ChartMaxx print server containing ImageGear Version 11 that was maintained at the MedPlus Cincinnati Data Center.  That server would assemble the requested pages of the multiple page document so that it could be printed by the end user at his or her office using a local printer. eMaxx has been "sunsetted" and is no longer a product that is being offered to any customers.

(Docket #304).  This disclosure supports Accusoft's summary judgment motion for breach of the 2001 Agreement -- the agreement governing the use of ImageGear Version 11.  Accusoft licensed distribution by the "concurrent user" distribution method only.  Accusoft has offered evidence from its designated expert, Matthew Decker, that ImageGear Version 11 is contained in every version of ChartMaxx.  (Docket #472-2).[10]  Moreover, Defendants concede that ImageGear object code is contained within its applications, including ChartMaxx.  (Docket #327-1, ¶ 9).  While this would appear to eliminate a genuine dispute as to whether MedPlus breached the 2001 Agreement by loading ImageGear Version 11 onto a server, before summary judgment would be warranted, there are two other issues to consider.

First, Defendants argue the installation of ChartMaxx applications containing ImageGear Version 11 onto a MedPlus server does not constitute a "distribution."  Defendants point to the definition of "distribution" in the 2001 Agreement, which is as follows:

> "Distribute" or "Distribution" means the distributing, deploying, selling, leasing, renting, licensing, lending or any other act whereby Licensee distributes the Application that contains a copy of [ImageGear Version 11] to an End User, whether such End User is internal or external to Licensee.

(Docket #182-1, Section 1.4).  Defendants argue that under this definition, the placement of ImageGear on MedPlus's server for potential access by an end user does not fall within

---

[10] Defendants attack Mr. Decker's methodology, and hence the reliability of his report, however as is discussed in the "substantial similarity" analysis in Point C below, I am satisfied that Mr. Decker's declaration is sufficiently reliable for purposes of summary judgment.

"distribution" because MedPlus never provided a copy of the software to end users; instead, they loaded it on their own servers.  Accusoft contends that creating an option for an end user to access ChartMaxx, even in this very discrete instance, is a distribution.  While the definition of "distribution" is not without some ambiguity, I find Defendants' interpretation to be indefensible. The loading of ImageGear Version 11 for potential access by end users, in my view, constitutes a use and distribution of the work.  The last phrase of the definition -- expressly including distributions that are "internal or external to Licensee" -- it could be argued, was intended to capture the very use at issue here.  Moreover, the breadth of the definition seems intended to capture every potential use.

The second issue is the statute of limitations.  Accusoft has not shown that MedPlus's loading of ChartMaxx onto its own server, and the <u>opportunity</u> of end users to access ChartMaxx in the discrete circumstance described in MedPlus's disclosure, occurred within the six year limitations period for breach of contract.[11]  It may well be that there are versions of ChartMaxx containing ImageGear Version 11 – according to Accusoft's expert Decker, they all did – that were developed within the limitations period, and logically the unlicensed use of these would not be time-barred.  However, Accusoft has not shown which version(s) of ChartMaxx were loaded onto MedPlus's servers for access by eMaxx users, and has not shown when MedPlus "sunsetted" this discrete, but complicated, function.  Accusoft has the burden to prove this and the existing record does not eliminate a genuine dispute on this issue.  Accordingly, I recommend that the motion for summary judgment claiming MedPlus's loading of ChartMaxx

---

[11]   I address more fully the Defendants' statute of limitations argument in the final section of this report and recommendation where I find that the statute of limitations applies to preclude any claims that pre-date November 14, 2005.

onto its own server violated the scope of the distribution method license in the 2001 Agreement be denied.

I would make this same recommendation for an additional reason: the factual predicates for Accusoft's motion are complicated, involving the integration of software, its use in a discrete circumstance, accessible through an internet browser.  The predicates are further complicated by certain technical language the parties, perhaps necessarily, use, and the indiscriminate use by lawyers and witnesses of "site" and "server" licenses.  (Docket #431, pp. 11, 14, 21; #431-2, p. 8).  For this reason, I believe this claim would benefit from a full evidentiary record.  Thus, even if the District Judge rejects my reasoning above, I recommend that motion be denied to allow for a full presentation of evidence at trial to ensure a just resolution of the claim.  See 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2725 (3d ed. 2004) ("In some situations, a fuller development of the facts may serve to clarify the law or help the court determine its application to the case….[I] n cases posing complex issues of fact and unsettled questions of law, sound judicial administration dictates that the court withhold judgment until the whole factual structure stands upon a solid foundation of a plenary trial where the proof can be fully developed, questions answered, issues clearly focused and facts definitively found."); Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1992) (summary judgment improper where a more complete factual record would be helpful to resolve complex issues of antitrust law).

Accordingly, I recommend that a factfinder should interpret the parties' agreements; the cross-motions for summary judgment on breach of the agreements should therefore be denied.  I now turn to Accusoft's claim that it possesses valid copyrights that have been infringed by Defendants' use and distribution of ImageGear

C.  Copyright

Accusoft has moved for summary judgment on its copyright infringement claims, arguing

that it possesses valid copyrights to ImageGear and that the Defendants' alleged unlicensed use

infringed these copyrights. [12]  Defendants have cross-moved for summary judgment on

Accusoft's copyright infringement claims,[13] arguing that Accusoft has presented no evidence to

satisfy its burden to show substantial similarity between the registered versions of ImageGear

source code and the object code that Defendants admit is located within their software.  For

summary judgment to be awarded to Accusoft, the undisputed material facts must show "(1)

ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  Likewise, for

summary judgment to be granted to Defendants, there must be a total lack of evidence supporting

Accusoft's claims.

Software is generally susceptible to copyright protection.  See Lotus Dev. Corp. v.

Borland Int'l, Inc., 49 F.3d 807, 813 n.5 (1st Cir. 1995) (citing 17 U.S.C. § 102(a)(1) and 17

U.S.C. § 101).  An assignee of a copyright (such as Accusoft) is not required to re-register a

copyright in order to preserve its right to statutory damages or as a prerequisite to instituting an

action; the initial registration of the copyright is sufficient.  Brode v. Tax Management, Inc., No.

88-C-10698, 1990 WL 25691, at * 7 (N.D. Ill. 1990) (construing 17 U.S.C. § 412 (1990),

Copyright Act, Pub. L. No. 100-568 §§ 5(1), (2), (13) (1988)).

---

[12]  The claims are Count II (Copyright Infringement v. MedPlus), Count III (Copyright
Infringement v. Quest), Count IV (Secondary Copyright Infringement v. Quest), Counterclaim
VI (Declaration of Non-Infringement by Quest), and Counterclaim VII (Declaration of Non-
Infringement by MedPlus).  (Docket #417).
[13]  The claims are Count II-IV.  (Docket #412).

1.   Standing

Defendants raise a threshold issue, challenging Accusoft's right to sue for any copyright infringement claims arising before December 1, 2008, when Accusoft acquired certain assets of Accusoft Delaware, including ownership of ImageGear.  Defendants claim that in the acquiring the assets of Accusoft Delaware, Accusoft failed to receive an explicit assignment of any "preexisting causes of action" for copyright infringement, and that such explicit assignment is a prerequisite to having standing to assert claims for infringement before December 1, 2008. Accusoft responds that Accusoft Delaware intended to transfer accrued causes of action, as it transferred to Accusoft "everything" it owned in the ImageGear products.  I recommend that Defendants' argument be rejected.

The copyright statute provides that "the legal or beneficial owner of an exclusive right under a copyright is entitled … to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501(b).  Among the exclusive rights in copyrighted work is the authority to transfer ownership.  See 17 U.S.C. § 106(3).  Where a copyright transfer agreement is silent as to the transfer of accrued causes of action, the scope of the transfer depends on the parties' intent.  SAPC, Inc. v. Lotus Dev. Corp., 921 F.2d 360, 363 (1st Cir. 1990).  The party seeking to deviate from the terms of a broad conveyance bears the burden of proving the deviation.  Id.   Applying these controlling principles, Defendants have failed to show that the asset transfer did not cover causes of action for infringement of ImageGear accruing before the asset transfer date or was ambiguous on this point to justify the use of parole evidence.

Here, while the asset transfer agreement does not expressly authorize Accusoft to sue for alleged copyright infringement occurring before the date of the transfer, it explicitly grants

Accusoft "all rights and powers to assert, defend, and recover title to the Intellectual Property," including the registered copyrights to ImageGear, ImageGear 2001, and ImageGear Professional Edition, among other copyrights related to ImageGear.  (Docket #429-3, Exhibit A "Purchased Assets").  Nearly identical language was considered by the court in SAPC.  There, the agreement provided for the transfer of "all of [SAPC's] right, title and interest in and to … all computer programs … and intellectual property."  SAPC, 921 F.2d at 362.  The court found this language to be an unambiguous assignment of any accrued claims for infringement, and rejected the plaintiff's argument that "accrued causes of action" needed to be explicitly expressed.  Id. at 365 (affirming district court's holding of the same).  Here, as noted, the asset transfer agreement uses transfer language nearly identical to SAPC.  Moreover, this broad grant of authority would be substantially undermined if it did not contemplate the rights and powers to sue for conduct predating the asset transfer; after all, once the transfer was effected, as the owner, Accusoft clearly would have the right and power to take all take these actions with respect to ImageGear. While this court's reading is not the only reading of the language, I believe it is the reading that best effectuates the parties' intent as evidenced in the document.

Defendants rely on Beckwith Builders, Inc. v. Depietri, for the proposition that "an assignment that purports to transfer 'all right, title, and interest' generally does not include the right to sue for acts of infringement that take place prior to the effective date of the assignment" unless granted expressly. No. 04-cv-282 SM, 2006 WL 2645188, at *8 (D.N.H. 2006) (citing 17 U.S.C. § 501(b) and 3 Nimmer on Copyright § 12.02[B] (1993)).  In my view, Beckwith does not help the Defendants.  Here, the transfer was broader than in Beckwith, and it clearly granted Accusoft "all rights and powers to assert, defend and recover title to Intellectual Property." Moreover, Beckwith's holding cannot be squared in this regard with SAPC, a controlling

authority.  Rather, <u>SAPC</u> instructs that if there is a question about what was transferred, we look to the agreement to determine what the parties intended in the context of whether the buyer was to acquire "everything the seller has" in relation to the intellectual property at issue, versus all intellectual property owned by the seller.  <u>See id.</u> at 362-63.

Defendants also argue that Accusoft Delaware retained some intellectual property, and argue that <u>SAPC</u> should be read narrowly so that its holding only extends to agreements that purport to transfer <u>all</u> intellectual property.  Here, the transfer excluded some of Accusoft's assets such as some bank accounts, receivables and intellectual property related to other Accusoft Delaware products, certain other patents, trademarks and copyrights. (Docket #429-3, Exhibits A, B).  The Defendants' argument misses the mark and is contrary to <u>SAPC</u>.  Instead of focusing on whether 100% of a party's intellectual property is transferred, the court focuses on whether the parties intended that 100% of the assets that are the subject of a transfer include any pre-existing copyright claims regarding those assets, as reflected in the final agreement.

Accepting the facts in the light most favorable to Accusoft, there is evidence that the asset purchase agreement conveyed accrued causes of action regarding ImageGear from Accusoft Delaware to Accusoft.  Accordingly, Defendants have failed to carry their burden to warrant a deviation from the broad conveyance rights of this case.  I recommend that Defendants' challenge to Accusoft's standing be denied.

2.  Do the Agreements Prevent MedPlus from Contesting Accusoft's Copyrights?

Accusoft claims that Section 5.2 of the 2001 Agreement prevents MedPlus from contesting the validity of any of Accusoft's ImageGear copyrights.  Turning to the language of the 2001 and 2003 Agreements, section 5.2 states "Licensee waives its right to contest any of

Accusoft's trademarks, service marks, trade names, copyrights, and other intellectual property and proprietary rights in and to the ImageGear Product."  (Dockets #182-1; #182-2).

Accusoft relies on Saturday Evening Post Co. v. Rumbleseat Press, Inc., for the proposition that such no-contest clauses are valid and enforceable.  816 F.2d 1191, 1200 (7th Cir. 1987).  In opposition, the Defendants assert that Accusoft cannot in effect write into a contract what is a legal judgment.  See Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd., 11-CV-00726, 2013 WL 4409434, at *19 (E.D.N.Y. Aug. 2, 2013); report and recommendation adopted as modified on other grounds, 2013 WL 4409434 (E.D.N.Y. Oct. 1, 2013).

In Rumbleseat, the Court of Appeals for the Seventh Circuit refused to adopt a federal common law outlawing a no-contest clause, finding instead that a no-contest clause "serves a useful purpose in most cases," as it would discourage a licensee from filing vexatious suits challenging the validity of the copyright it had licensed.  Id. at 1199-1200.  The plaintiff there possessed a copyright for porcelain dolls fashioned after Norman Rockwell illustrations and granted defendant an exclusive license to create and market such dolls.  Id. at 1192-93.  The license agreement contained a no-contest clause which stated defendant could not dispute the validity of the copyright.  Id. at 1193.  The Rumbleseat court reasoned that if a copyright licensee has doubts about a validity of a copyright, it would be better if the licensee conducted its due diligence before signing any agreement.  Id. at 1201.

At oral argument, acknowledging Rumbleseat, Defendants conceded that the clause could be enforced to prevent them from contesting the validity of the copyright, but they argued forcefully that Rumbleseat's holding is limited and does preclude a challenge to allegations of copyright infringement.  Defendants argued that their ability to contest whether they have infringed Accusoft's copyright by incorporating ImageGear into Defendants' software is a

different inquiry than the inquiry into whether the ImageGear copyright is valid.  I am persuaded by Defendants' argument.  The provision at section 5.2 of the 2001 and 2003 Agreements addressed and waived the Defendants' right "to contest any of Accusoft's trademarks … in and to the ImageGear Product."  In seeking summary judgment on infringement, the Defendants do not contest the ImageGear copyright; rather, they allege that the version of ImageGear that they copied is actually a different version than Accusoft registered with the Copyright Office.  A discussion regarding whether Defendants' have infringed the copyright follows infra; however, with respect to Accusoft's argument that section 5.2 bars the Defendants' infringement claims, Accusoft's argument fails.  Defendants are therefore permitted to contest whether their conduct has infringed the ImageGear copyright.

    3.  Does Accusoft Own Valid Copyrights to ImageGear?

    For Accusoft to be awarded summary judgment on its claims of infringement, it must first show that it owns a valid copyright to ImageGear.  See Feist, 499 U.S. at 361.  Likewise, for Defendants to be awarded summary judgment, they need to show that Accusoft cannot meet its burden of proving it owns a valid copyright.

    At oral argument, the Defendants conceded that Accusoft has a valid copyright in ImageGear.  Further, as discussed, under Section 5.2 of the 2001 and 2003 Agreements, the Defendants waived the right to contest the validity of Accusoft's copyrights.  However, ImageGear Version 14 is governed by the 2006 Agreement, and its terms are unknown.  Thus, I will address the argument raised in the Defendants' opposition memorandum (Docket #462): that Accusoft's copyright in ImageGear Version 14 is not valid because it was registered more than five years after it was first published.

Subject to certain exceptions, the Copyright Act requires a copyright holder to register the work before suing for copyright infringement.[14]  17 U.S.C. § 411(a).  Section 411(a) provides, generally, that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."  "In judicial proceedings, a certificate of a copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid."  Lotus, 49 F.3d at 813 (quoting Bibbero Sys. v. Colwell Sys., Inc., 893 F.2d 1104, 1106 (9th Cir. 1990)).  Accusoft has appended to its complaint certificates of registration.   (Docket #182-4).  Accusoft registered ImageGear Version 14 on October 5, 2010.  (Docket #182-4, p.20).  According to the registration, it was first published on August 15, 2005.  (Id.).  The automatic presumption would apply if the work was registered on or before August 15, 2010; instead, the registration occurred 51 days beyond the five-year period.  Therefore, there is no automatic presumption of validity; but the court may, in its discretion, look to the equities based on the "totality of admissible evidence," to determine whether the presumption should be applied.  CJ Prod. LLC v. Concord Toys Int'l, Inc., No. 10-5712, 2011 WL 178610, at *3 (E.D.N.Y. 2011); 17 U.S.C. § 410(c).[15]  For several reasons, I

---

[14]   With respect to claims of copyright infringement of a computer program, like here, a copyright holder must first register the computer program with the Copyright Office by depositing one copy of the first and last 25 pages or equivalent units of the source code.  37 CFR 202.20(c)(2)(vii)(A)(1).  "In the case of revised versions of computer programs, … if the revisions do not occur in the first and last 25 pages, the deposit should consist of the page containing the copyright notice and any 50 pages of source code representative of the revised material … ."  Id.  Once the source code is properly registered, protection extends to both the source code version and the object code version.  See Hutchins v. Zoll Med. Corp., 492 F.3d 1377, 1383 (Fed. Cir. 2007); Data General v. Grumman Sys. Support Corp., 825 F. Supp. 340, 354 (D. Mass. 1993).

[15]   This subsection provides that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie

choose to exercise my discretion to find that Accusoft's ImageGear Version 14 copyright is valid.

First, the registration occurred only 51 days outside the grace period that would trigger the presumption.  Compare CJ Prod., 2011 WL 178610, at *3 (finding that because the plaintiff had been diligent in registering its copyrights, having registered 35 of 40 copyrights from the same product within the first five years of publication, the totality of the circumstances caused the court to find that the late-filed registrations were entitled to a prima facie presumption of validity), with Brown v. Latin Am. Music Co., 498 F.3d 18, 24 (1st Cir. 2007) (exercising the court's discretion to determine that the certificate should be given little or no weight as it had been published more than twenty years earlier).  Second, other copyright office registrations of show that Accusoft regularly and timely registered other versions of ImageGear.  See CJ Prod., 2011 WL 178610, at *3.  Third, Defendants have not offered any evidence suggesting that the copyrights are invalid.  See Michael Grecco Photography, Inc. v. Everett Collection, Inc., 589 F. Supp. 2d 375, 382 (S.D.N.Y. 2008).  The totality of these facts satisfy me that there is no genuine issue of material facts regarding Accusoft owning a valid copyright in ImageGear.

---

evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court."  17 U.S.C. § 410(c).

4.   Has Accusoft Established Copyright Infringement?[16]

To succeed on its claim for infringement, Accusoft must also show "copying of constituent elements of the work that are original." Feist, 499 U.S. at 361.  The inquiry into copying "itself involves a bifurcated inquiry because all copying does not invariably constitute copyright infringement." Airframe Systems, Inc. v. L-3 Commun's Corp., 658 F.3d 100, 105 (1st Cir. 2011) (citations omitted).   "To establish actionable copying for the purposes of copyright infringement, the plaintiff must prove both: '(a) that the defendant actually copied the work as a factual matter,' and '(b) that the defendant's copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" Id. at 105-06 (quoting Situation Mgmt. Sys., Inc. v. ASP Consulting, LLC, 560 F.3d 53, 58 (1st Cir. 2009)).  Proof of both species of copying is essential for a copyright owner to prevail on a claim of infringement.  Airframe, 658 F.3d at 105 (quoting 4 Nimmer § 13.01[B], at 13–10).

a.   Factual Copying

The First Circuit has laid out two ways in which a plaintiff may satisfy the first component of the Feist inquiry, factual copying or what is sometimes referred to as probative similarity.

> [The plaintiff] may either present direct evidence of factual copying or, if that is unavailable, evidence that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so

---

[16]   For purposes of summary judgment, and to simplify matters, the following discussion applies generally to both MedPlus and Quest.  It is undisputed that MedPlus signed all three agreements; thus, Accusoft's claims for direct infringement are against MedPlus.  However, in March 2008, the six MedPlus employees who maintained the OptiMaxx program for MedPlus, became Quest employees and continued to perform the same duties regarding OptiMaxx for Quest that they had performed as MedPlus employees.  (Docket #461, ¶ 14).  Accusoft's claims against Quest are for both direct and secondary infringement, but for summary judgment, the many material facts in dispute, prevent any finding of infringement.

> similar that the court may infer that there was factual copying (<u>i.e.,</u>
> probative similarity).

<u>Lotus</u>, 49 F.3d at 813 (citations omitted).

Here, it is undisputed that Defendants actually copied ImageGear object code.[17]  The record is replete with Defendants' admissions to copying ImageGear object code.  For instance, in response to a court order earlier in this litigation, Defendants offered the following description of their use of ImageGear:

> In 2005, MedPlus purchased an additional SDK for ImageGear Version 14 for use in OptiMaxx.  Later that year, MedPlus began releasing OptiMaxx Version 2.3.20 with ImageGear Version 14 to MedPlus OptiMaxx customers and to Quest Diagnostics for its internal use of OptiMaxx as part of the Quest Diagnostics business operations.  The use of ImageGear in OptiMaxx allowed a MedPlus customer to view, store, and print electronic documents.  ImageGear Version 14 was the only SDK that was used in developing OptiMaxx.  OptiMaxx .Net version 3.0 was developed using ImageGear Version 14, but no OptiMaxx .Net version containing ImageGear was ever deployed to a customer.

(Docket #304, p.3).  And, in opposing a motion to compel, Defendants' counsel represented the following:

> Much of Accusoft's discovery is tailored to determine <u>whether</u> Defendants copied ImageGear.  Defendants have admitted that they copied ImageGear; the issue is whether there was a valid license to do so.  Allowing Accusoft to dig around in Defendants' proprietary software code and other irrelevant documents to confirm what Defendants have already admitted is improperly cumulative and duplicative.

(Docket #112, p. 2).  In addition, David Brackman, a Quest software engineer filed a declaration dated January 24, 2014, stating in part:

---

[17]  Object code is the encryption of the human-readable copyrighted source code.  <u>See</u> <u>Data Gen. Corp. v. Grumman Sys. Support Corp.</u>, 803 F. Supp. 487, 490 (D. Mass. 1992) (citations omitted).  In other words, object code is derived from source code.  <u>Id.</u>  Copyright of the source code protects the object code as well.  <u>Id.</u>

> I declare as follows:  Defendants have or have had ImageGear Pro Version
> 11, ImageGear Pro Version 13, ImageGear Pro Version 14, ImageGear
> Pro Version 16, ImageGear.Net Version 2 and ImageGear.Net Version 15
> in their possession.  These products were located on a server maintained
> by the ChartMaxx developers in a folder named "CDArchive."

(Docket #327-1, ¶ 9).  Finally, other parts of the record reflect Defendants' admission to actual

copying of ImageGear object code.  (Docket #414-1, at ¶¶ 32-38, 72).

   b.   Substantial Similarity

   The second essential component of copying is a showing that the defendant's copying of

the copyrighted material was so extensive that it rendered the infringing and protected works

"substantially similar."  Accusoft contends that where direct copying is admitted, this court's

inquiry must end with a finding of infringement.  However, as Defendants rightly posit, this

proposition is at odds with decisions from this circuit.  See Airframe, 658 F.3d at 105-06; Lotus,

49 F.3d at 813 (after proving factual copying, the "plaintiff must then prove that the copying of

copyrighted material was so extensive that it rendered the offending and copyrighted works

substantially similar"); see also Data Gen. Corp. v. Grumman Sys. Support Corp., 803 F. Supp.

487, 490 (D. Mass. 1992) ("Data General must prove that the object code programs admittedly

copied and used by Grumman were representations of the copyrighted versions of ADEX.").

   In Airframe, the plaintiff, Airframe, accused the defendant, L-3, of copying Airframe's

ARMS software source code, so that L-3 could create its own replacement software program.

658 F.3d at 103.  Because there was no admission of copying by L-3, Airframe was required to

establish that L-3 had copied the software source code.  Id. at 105-106.  To prove copying,

Airframe relied on an affidavit from its president who averred that he discovered the presence of

"some unspecified version of the ARMS source code" on L-3's computer, which he suspected

had been loaded by a former Airframe employee.  Id.  The court determined that to preclude

summary judgment for L-3 on its infringement claims, Airframe had to submit some evidence

which showed that what was on L-3's computer was substantially similar to the copyright

deposit material for ARMS.  Id. at 106-107.  Airframe submitted no evidence regarding the

materials it had registered with the Copyright Office; instead, Airframe submitted for

comparison an unregistered version of ARMS that was developed years after the copying by L-3

had occurred.  L-3 argued that the later version of ARMS had no probative value, and was,

therefore, not evidence of the content of the ARMS copyright deposit material from prior years.

Id. at 107.  The District Court, and later the Court of Appeals for the First Circuit, agreed:

Airframe had not produced the relevant source code needed to support its claim that L-3 was

substantially similar to the registered version of ARMS that Airframe claimed had been copied.

Id. at 107-08.

        In my view, Accusoft's position cannot be squared with controlling law, and as the

plaintiff, Accusoft is required to prove substantial similarity between the source code it

registered with the Copyright Office and the object code Defendants copied.  Therefore, I now

turn to the inquiry required by such cases and examine whether the motions for summary

judgment have created a factual record which conclusively establishes that Accusoft has -- or has

not -- shown that versions of ImageGear contained in Defendants' software are "substantially

similar" to the registered version(s) of ImageGear.

        "Substantial similarity exists if a reasonable, ordinary observer, upon examination of the

two works, would conclude that the defendant unlawfully appropriated the plaintiff's protectable

expression."  Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC, 560 F.3d 53, 58 (1st Cir.

2009) (quotations omitted).  "After identifying the aspects of the plaintiff's work that are

protected by copyright, substantial similarity is assessed by comparing the protected elements of

the plaintiff's work as a whole against the defendant's work." Id. at 59.  A plaintiff must first

introduce evidence of the material it deposited when the copyrighted work was registered, and

then provide evidence allowing the factfinder to draw the inference of similarity.  Airframe, 658

F.3d at 105.  Although a finding of substantial similarity is usually left to the factfinder,

summary judgment is appropriate if a court can conclude that no reasonable jury could view the

evidence differently. See id. at 107-08 (granting summary judgment where Airframe produced

insufficient evidence to create genuine issue of fact as to substantial similarity); Segrets, Inc. v.

Gillman Knitwear Co., 207 F.3d 56, 62 (1st Cir. 2000) (affirming that summary judgment is

appropriate where ordinary observer could only find substantial similarity).

      Here, relying on case law discussed above, Defendants argue that Accusoft has failed to

introduce facts showing substantial similarity between the source code covered by the deposit

materials at the Copyright Office, and the object code that Defendants admit is embedded within

their software applications.  I find that there are questions of fact regarding the issue of

substantial similarity which prevent summary judgment for either Accusoft or Defendants.

      Some context is necessary.  In order obtain a certificate of copyright registration from the

Copyright Office, the registrant must submit an application, the fee, and a deposit of a

representative work.  17 U.S.C. § 408.  If the protected work is a computer program, like here,

the registrant must deposit generally the first and last 25 pages of the human-readable source

code, some of which may be redacted if it includes trade secrets.  37 C.F.R. § 202.20(c)(2)(vii)

(2012).  The materials on deposit are therefore representative of the work that is being registered.

By challenging whether Accusoft has proven its registered ImageGear source code is

substantially similar to the ImageGear object code incorporated into Defendants' software,

Defendants are effectively claiming that Accusoft has failed to compare the source code versions

covered by Accusoft's registrations (not the 50 pages on deposit) to the incorporated object code.

See Airframe, 658 F.3d at 106.

During discovery, Accusoft produced source code in native format for each version of ImageGear covered by registrations that Defendants identified as being at issue.  (Docket #447, ¶ 4).[18]  Defendants admit that they received ImageGear in object code format, and never received source code.  (Dockets #414, ¶¶ 109-110; #422, ¶ 5).  At oral argument, Defendants agreed that the object code that they received was immutable; in other words, what they received is what is embedded in their software applications containing ImageGear.  (Docket #547, pp. 7-8).  In its summary judgment filings, Accusoft has offered two declarations, of Matthew Decker and Christopher Lubeck.  When these declarations are assessed in this context, the record is sufficient, in the light most favorable to Accusoft, and uncontroverted by Defendants, to establish there are facts regarding the content of the deposit material that could allow a factfinder to decide substantial similarity exists.

Matthew Decker is Accusoft's technical expert.  (Docket #472).  In his declaration he describes various analyses he performed on media produced by Defendants that contained native format source code and executable files, which this court understands from oral argument to be another way to describe object code, for Defendants' software applications, including OptiMaxx. (Id., ¶¶ 4-18).  His analyses resulted in his determination, memorialized in an exhibit to his declaration, establishing the presence of ImageGear object code versions 11, 13, 14, and 16 in Defendants' software.  (Docket #472-2).  Because the object code is immutable, and because it is nothing more than the encryption of the source code for the corresponding versions of

---

[18]   I am satisfied that the only dispute as to this production is that Accusoft erroneously produced source code for Version 12 instead of Version 11, and upon learning of this error, corrected it by producing source code for Version 11.  (Docket #447, ¶ 4).

ImageGear that Accusoft delivered to MedPlus pursuant to the licensing agreements, I find the declaration from Mr. Decker is sufficient evidence to link the object code in Defendants' software applications with the source code Accusoft produced in discovery (the source code for the ImageGear versions Defendants identified as being at issue).

The declaration of Christopher Lubeck provides the additional link to enable a factfinder to determine substantial similarity; that is, he links the source code Accusoft produced in discovery to the source code deposited with the copyright office. (Docket #447). Mr. Lubeck was the Vice President of Technology Infrastructure for Accusoft, and now serves as Vice President of Customer Satisfaction. (Id., ¶ 2). He avers generally to the process by which Accusoft maintains and preserves the integrity of its ImageGear source code. (Id., ¶ 8). Importantly, Mr. Lubeck declares that during discovery in this litigation, Accusoft has produced source code that "is a human-readable representation of the ImageGear object code identified by Defendants as incorporated within ChartMaxx, OptiMaxx and eMaxx." (Id., ¶¶ 9-10). He further expressly avers that "[t]he ImageGear source code Accusoft produced to Defendants in discovery corresponds with enumerated versions of ImageGear that Accusoft registered with the Copyright Office." (Id., ¶ 11). I find that this evidence is sufficient evidence to complete the link from Defendants' object code to the source code deposited with the Copyright Office.

Defendants challenge the validity of both declarations. They vigorously protest that, contrary to Mr. Decker's declaration, his analysis was deficient because it involved only key word searches. They also challenge his findings, claiming that he limited his analysis to the Defendants' software, and did not include an analysis of Accusoft's software or its source code deposited with the Copyright Office. These objections may provide fodder to impeach Mr. Decker and his analysis; and, Decker's declaration, standing on its own, would be insufficient to

establish substantial similarity because the scope of his analysis did not include Accusoft's registered source code. However, issues of credibility and reliability are ultimately for a factfinder. White v. W.W. Grainger Co., Inc., 1988 WL 290663, at *3 (D. Mass. Feb. 16, 1988) (citing Hoover v. Switlik Parachute Co., 663 F.2d 964, 968 (9th Cir. 1981)). Considering the evidence in the light most favorable to Accusoft on Defendants' motion, I find that Decker's declaration is sufficiently reliable for purposes of summary judgment.

Defendants also object to Mr. Lubeck's declaration and his qualifications. They characterize his averment that the source code produced in discovery corresponds with deposit material as a conclusory, self-serving statement lacking any foundation. While there is some merit to the argument that Mr. Lubeck's declaration is thin, contrary to Defendants' objection, there is some foundation for his averments. Mr. Lubeck's declaration avers that his statements are made on personal knowledge. (Docket #447, ¶ 1). It includes facts which explain Accusoft's position regarding what it produced and how it matches what is on deposit. (Id., ¶¶ 4-11). For instance, Defendants alleged that the deposit copy of ImageGear Version 14 was really just another copy of ImageGear Version 13. Mr. Lubeck states that he "researched and reviewed the deposit copies … [and] confirmed they are not identical," and he went on to describe differences between the deposit copies of the two versions. (Id., ¶¶ 5-7). Similarly, Mr. Lubeck reviewed source code for Versions 11 and 12 in response to Defendants' claim that they had received Version 12 instead of Version 11. While there is no description of his qualifications in the declaration, I am satisfied that Mr. Lubeck's title, his responsibilities in this litigation, and his ability to research and review deposit copies and compare them with source code preserved by Accusoft, suggests enough training and skill in the area to give some weight to his statements.

Beyond these objections, Defendants have not presented evidence that the production of source code did not match the object code.  Rather, Defendants concede that object code cannot be manipulated, that their software contains the object code from ImageGear, and that they did not have access to ImageGear source code.  (Docket #422, ¶¶ 4-5; #461, ¶ 61).  While, as Defendants argue, it is Accusoft's burden to establish substantial similarity, the Decker and Lubeck declarations furnish enough evidence to warrant a factfinder to decide substantial similarity.  Summary judgment is appropriate only when an ordinary observer would be compelled to conclude that no substantial similarity exists between the copyrighted work and the allegedly infringing work.  O'Neill v. Dell Publ'g Co., 630      F.2d 685, 687 (1st Cir. 1980).  The admission of copying, coupled with the findings of Mr. Decker and Mr. Lubeck, raise sufficient facts that could lead an ordinary observer, to find substantial similarity between the parties' software products.  Summary judgment is therefore not warranted for Defendants on their copyright claims (Counts II, III and IV of the amended complaint).  Likewise, Accusoft has not carried its burden to convince this court that it has connected all the dots necessary to warrant summary judgment on its infringement claims.  Accusoft's proof is too tenuous to convince this court that there is no genuine dispute that what was copied was substantially similar to what was registered with the Copyright Office.  Both Decker and Lubeck may be discredited at trial.  Such questions of weight and credibility are for a factfinder.  Aly v. Mohegan Council, Boy Scouts of America, 871 F. Supp. 2d 19, 26 (D. Mass. 2012).  This is not to say that Accusoft is unable to prove the link, but on this record, I recommend that Accusoft's motion for summary judgment on its copyright claims (Counts II, III and IV of the amended complaint, and Counterclaims VI and VII) should be denied.

D.  <u>Are Claims Analyzed Under Copyright or Contract Laws?</u>

Having established that Accusoft and MedPlus entered into three separate agreements, and that Accusoft has valid copyrights in ImageGear, I now turn to the question of whether Accusoft's claims sound in copyright law (as Accusoft contends) or in contract law (as argued by the Defendants).  Defendants move for summary judgment, arguing that by licensing ImageGear, Accusoft has waived its right to sue for copyright infringement and should be limited to claims for breach of the licensing agreements.  I recommend that this argument be rejected, and find that the agreements contain terms that, if breached, would permit Accusoft to pursue either copyright or contract claims.

In their motion for summary judgment, Defendants cite to the proposition that "[a] copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement" and may only sue for breach of contract. <u>See</u> <u>John G. Danielson, Inc. v. Winchester-Conant Props., Inc.</u>, 322 F.3d 26, 40 (1st Cir. 2003). Further briefing by the parties relevant to this proposition focused not on the legal question whether this suit sounds in contract only or also in copyright, but on the factual question whether Defendants' conduct violated the terms of the software licensing agreements.  Accordingly, I requested further supplemental briefing on the legal issue and received submissions from both parties.  Defendants' responsive memorandum argues that all of Accusoft's allegations stem from unlicensed uses of ImageGear that were addressed within the scope of the license, which means the allegations sound in contract claims and not copyright infringement.  (Docket #555). Accusoft argues the opposite, claiming the language in the licensing agreements suggests that the unlicensed use of ImageGear fell outside the scope of the license it granted MedPlus in a manner that implicates one of its exclusive statutory rights under the Copyright Act, and therefore that

summary judgment for Defendants on this issue should be denied.  (Docket #556).  For the

reasons discussed below, I find that there are genuine disputes as to material facts, and I

therefore recommend that Defendants' motion for summary judgment on this basis be denied.

An action seeking to enforce "a copyright license raises issues that lie at the intersection

of copyright and contract." Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 129

(D. P.R. 2014) (quoting MDY Indus., LLC v. Blizzard Entm't, Inc., 629 F.3d 928, 939 (9th Cir.

2010)).  It is settled law in this circuit that uses of a copyrighted work that stay within the scope

of a nontransferable license are immunized from copyright claims. John G. Danielson, 322 F.3d

at 40 (citing Graham v. James, 144 F.3d 229, 236 (2nd Cir. 1998)).  Stated differently, a

"copyright owner who grants a non-exclusive limited license ordinarily waives the right to sue

licensees for copyright infringement, and it may sue only for breach of contract." MDY Indus.,

629 F.3d at 939 (quoting Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1121 (9th

Cir. 1999)).  "However, if a licensee acts outside the scope of the license, the licensor may sue

for copyright infringement." MDY Indus., 629 F.3d at 939.  To determine whether a licensee's

failure to comply with a term in a license agreement is an infringement or a breach, a court must

first determine if the improper conduct amounts to a breach of a covenant made by the licensee,

or if the conduct consists of a failure to satisfy a condition of the license. Id. (citing Graham, 144

F.3d at 236).

Contractual terms that limit a license's scope are "conditions," and are remedied by

claims of infringement. MDY, 629 F.3d at 939.  All other license terms are covenants, the

breach of which is actionable only under contract law via a breach of contract claim. Id.

Distinguishing covenant from condition depends on state contract law. Id.  The software

licensing agreements at issue in this case are government by Massachusetts law.  (Docket #182-

1, Section 10.6; Docket #182-2, Section 10.6).  In Massachusetts, a condition defines an event which must occur before an obligation to perform arises under the contract.  <u>Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers</u>, 411 Mass 39, 42 (1991).  Parties to a contract are, of course, free to impose whatever conditions they choose.  <u>Id.</u>  To determine whether the parties intended to create a condition, a court considers the words used by the parties, the contract taken as a whole, and the surrounding facts and circumstances.  <u>Id.</u> at 46 (citation omitted).  "'Emphatic words' are generally considered necessary to create a condition precedent that will limit or forfeit rights under an agreement."  <u>Mass. Mun.</u>, 411 Mass. at 46 (citing Restatement (Second) of Contracts § 226, cmt. a (1981) (words often used to create a condition precedent are "on condition that," "provided that," and "if."));  <u>Canton v. Thomas</u>, 264 Mass. 457, 458-59 (1928) (the phrase "if and when," but not "when" alone, creates a condition precedent).  If the contract is open to multiple reasonable interpretations, then the contract's meaning is a jury question and not properly decided on summary judgment.  <u>Farmer's Ins. Exch.</u>, 632 F.3d at 784.

Applying these principles to copyright law, "[t]o recover for copyright infringement based on a breach of a license agreement, (1) the copying must exceed scope of the defendant's license and (2) the copyright owner's complaint must be grounded in an exclusive right of copyright (<u>e.g.</u> unlawful reproduction or distribution.)."  <u>MDY Indus., LLC</u>, 629 F.3d at 940. However, contractual rights can be much broader:

> [C]onsider a license in which the copyright owner grants a person the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages. Obviously, a licensee who made a hundred copies of the book would be liable for copyright infringement because the copying would violate the Copyright Act's prohibition on reproduction and would exceed the scope of the license. Alternatively, if the licensee made a single copy of the book, but read the last ten pages, the only cause of action would be for breach of contract, because reading a book does not violate any right protected by copyright law.

Id. (quoting Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc., 421 F.3d 1307, 1315–16 (Fed. Cir. 2005)).  Therefore, the potential for infringement exists only where a licensee's action exceeds the license's scope in a manner that implicates one of the licensor's exclusive statutory rights.  Id.

Here, Accusoft's amended complaint describes the following conduct to support its claims based on both breach of the licensing agreements and copyright infringement:[19]  MedPlus, without authorization, incorporated ImageGear into OptiMaxx and distributed it; MedPlus exceeded the number of concurrent user licenses it purchased; MedPlus used unauthorized methods to distribute ImageGear, including "server" distribution; MedPlus failed in its distributions to acknowledge its license usage and Accusoft's ownership of ImageGear; MedPlus failed to provide copies of its software Applications containing ImageGear; MedPlus transferred its license to its parent, Quest; and, MedPlus and Quest continued to distribute or otherwise use ImageGear after termination in December 2010 of the license.  (Docket #182).  I apply the legal principles discussed above to the software licensing agreements to determine whether such conduct, if proved, sounds in contract, copyright, or both.

1.   2001 License Agreement

On the existing record, the 2001 Agreement does not operate as a waiver by Accusoft to bring claims for copyright infringement and otherwise limit its remedy to an action in contract. There are terms in the agreement, discussed below, that appear to be conditions precedent.

---

[19]   While Accusoft can pursue either remedy, recovery for only one type of claim is permitted. Costello Publ'g Co. v. Rotelle, 670 F.2d 1035, 1041 (D.C. Cir. 1981).  See also Modern Licensing Law § 11:24-11:25 (2014) (a contract or intellectual property law remedy is allowed, however the court must monitor the claim to prevent double recovery); Computer Associates Intern., Inc. v. Altai, Inc., 982 F.2d 693, 720 (2d Cir. 1992) (noting that plaintiff only suffered one injury and thus "[plaintiff] may not obtain a double recovery where the damages for copyright infringement and trade secret misappropriation are coextensive").

Summary judgment as a matter of law, to the extent it depends on the 2001 Agreement, should therefore be denied.

The 2001 Agreement contains conditions that clearly limit the scope of the license Accusoft granted.  MedPlus was licensed to (A) distribute a maximum of 4,500 copies of ImageGear Version 11; (B) by a concurrent user method; (C) in two MedPlus applications, ChartMaxx and eMaxx.  (Docket #182-1).  The 2001 Agreement was "nontransferable," and expressly prohibited transfer or assignment of the license under any circumstance, unless Accusoft first approved in writing.  (Id., Sections 2.1 and 10.4).  I find that a breach of any of these conditions would clearly implicate Accusoft's exclusive statutory rights, including the right "to distribute copies … of the copyrighted work to the public by sale … or by rental, lease or lending."  See 17 U.S.C. §106(3).  Finally, the 2001 Agreement expresses many of these conditions in emphatic language that the Restatement (Second) of Contracts and case law deem hallmarks of a condition.  For instance, Section 2.1 of the 2001 Agreement states:

> Subject to the terms and conditions set forth in this Agreement, Accusoft grants Licensee a non-exclusive, nontransferable, worldwide license to use [ImageGear] to incorporate all or portions of [ImageGear] into the Application, and to distribute to End Users a copy of the Distributable Files in such Application by the Distribution Method or Methods identified on the face page of the agreement.  If the Distribution Method contains a maximum fixed number of End Users, Licensee shall not distribute more than the maximum number identified on the face page of this Agreement.  Licensee may not otherwise use, copy or distribute ImageGear … If Licensee desires to use, incorporate, and/or distribute [ImageGear] into another application, Licensee shall purchase additional development and distribution licenses from Accusoft at Accusoft's then-current list prices.

(Docket #182-1, Section 2.1) (emphasis added).

In opposition, Defendants seize on the following language of the 2001 Agreement (which appear in all capital letters in the 2001 Agreement):

> Distribution of the application to more end users than the maximum fixed number of licenses granted under this agreement, or based on a distribution method not authorized by this agreement, shall constitute a breach of this agreement.  In such event, Licensee agrees that Accusoft is entitled to obtain as liquidated damages and not as a penalty, its quantity one fees for each additional copy distributed.

(Docket #182-1, Section 3.3).  As Defendants note, courts have held that payment terms for excess use are covenants.  For instance, in <u>Madison River Mgmt. Co. v. Bus. Moment. Software Corp.</u>, the licensing agreement provided that if Madison exceeded the number of licenses purchased, it would have 30 days to remit payment for the actual number of licenses used.  387 F. Supp. 2d 521, 534 (M.D.N.C. 2005).  The district court noted that the agreement presupposed that excess use would come before payment, essentially granting permission for excess use and providing a payment remedy for it.  <u>Id.</u>  Similarly, in <u>Graham</u>, the Second Circuit held that payment of royalties was a covenant of a licensing agreement where permission for use of copyrighted work preceded payment.  144 F.3d at 236.

Here, it can be argued that the 2001 Agreement also contemplates excess use before payment.  It also provides an express remedy in such cases.  Moreover, the Agreement does not treat such a breach as terminating the license, but gives Accusoft the option of terminating in the event of breach.  (Docket #182-1, Section 8.2).  The tension between Sections 2.1 and 3.3 shows, as to this component of the license only, that there is a question of fact as to whether, the limitation on the scope of the license is a covenant and not a condition.  The payment remedy does not address other limitations in the license.  Accordingly, as a matter of law, summary judgment based on a waiver of copyright claims should be denied.

2.   2003 License Agreement

For the same reasons, the 2003 Agreement does not operate as a waiver by Accusoft. The 2003 Agreement contains conditions that clearly limit the scope of the license Accusoft granted.  MedPlus was licensed to (A) distribute a maximum of 5,000 copies of ImageGear Version 13; (B) by concurrent user, client/server, and site license distribution methods; (C) in any application MedPlus developed in accordance with the protocol in the 2003 Agreement. (Docket #182-2).  The 2003 Agreement is "nontransferable," and expressly prohibits transfer or assignment of the license under any circumstance, unless Accusoft first approves in writing.  (Id., Sections 2.3 and 10.4).  A breach of any of these conditions would clearly implicate Accusoft's exclusive statutory rights under Title 17.  The 2003 Agreement also expresses conditions in emphatic language that indicate conditions instead of covenants.  For instance, the 2003 Agreement provides in relevant part:

> Distribution License.  Subject to the terms and conditions set forth in this Agreement, Accusoft grants Licensee a non-exclusive, non-transferrable, worldwide license to distribute to End Users (either directly or indirectly) a copy of [ImageGear] in any applications developed pursuant to Section 2.2 by the Distribution Method identified on the Order Form during the Term of the Agreement.

(Docket #182-2, Section 2.3) (emphasis added).  Section 2.2 in turn essentially authorizes MedPlus to purchase an SDK to explore incorporation of ImageGear Version 13 into one or more new applications.

The 2003 Agreement also provides a remedy that would apply if MedPlus exceeded the limit on distribution licenses:  payment for more licenses.  (Id., Section 3.4).  Even though a payment remedy is provided, it is just one fact a court considers when classifying a clause as a condition or covenant, for the reasons I discuss above in my analysis of the 2001 Agreement.

On the basis of this record, the 2003 Agreement certainly contains conditions; by licensing the use of ImageGear pursuant to that agreement, Accusoft did not waive its right to sue for copyright infringement.  Therefore, I recommend that Defendants' summary judgment motion, to the extent it relies also on the 2003 Agreement, be denied.

### 3.   2006 Software License Agreement

As noted above, contrary to the positions of both parties that the documentation generated in connection with a further order of 5,000 distribution licenses in December 2006 is not an agreement, I find that Accusoft and MedPlus entered into a Software License Agreement in December 2006.  As discussed above, the 2006 Order Form, which is executed by both parties, expressly provides that execution is acceptance of "the terms and conditions of the Software License Agreement located in the 'Help' dialog box that accompanies the product."  (Docket #182-3).  The Order Form governs "ImageGear Professional v. 14, on any platform, for Concurrent User Deployment Seats."  Id.  Although the foregoing analysis of the previous two licensing agreements may be useful in determining whether provisions in the 2006 Agreement are conditions which limit the scope of the license and therefore give rise to copyright infringement, as Defendants very belatedly pointed out at argument on summary judgment, the document entitled Software License Agreement which is presented in Exhibit C to the Amended Complaint has not been authenticated as the agreement referenced in the Order Form.[20] Accordingly, it would be an academic exercise to analyze the conditions and covenants of what is appended to the Amended Complaint, and make recommendations on whether a breach of

---

[20]   In order to avoid unfairness, I recommend that Accusoft be permitted at trial to authenticate the Software License Agreement.  In light of my recommendation on the 2001 and 2003 agreements, I do not think that allowing authentication will significantly change the scope of the claims and evidence at trial.

such provisions would sound in both contract and copyright.  Defendants' waiver argument is rejected and its motion for summary judgment is denied because its resolution turns on the question of what are the covenants and conditions of the 2006 Agreement.[21]

E.  The Statute of Limitations

Defendants contend that Accusoft's breach of contract claims are time-barred by a six-year statute of limitations.  Accusoft counters that its claims are timely because Accusoft only learned of the breaches in July 2010.  Accusoft contends that a factfinder should determine when it knew, or should have known, of any alleged breaches.

A claim for breach of contract is governed by a six-year statute of limitations.  Mass. Gen. Laws ch. 260, § 2.  Generally, a cause of action accrues at the time of the breach.  Berkshire Mutual Ins. Co. v. Burbank, 422 Mass. 659, 661 (1996).  There are, however, limited circumstances in contract cases when the "discovery rule" tolls the statute of limitations.

For example, in Melrose Housing Auth. v. New Hampshire Ins. Co., the Massachusetts Supreme Judicial Court reviewed a master's finding that the construction defects on a work site were inherently unknowable.  402 Mass. 27, 31-34 (1988).  In rejecting the master's finding, the SJC concluded "that, in view of the contract provisions providing that the owner or his

---

[21]   In order to be of some help in facilitating resolution of matters – candidly, I studied the 2006 Agreement unaware, until oral argument that there was a challenge to its authenticity – I identify what strike me as important differences between the 2006 and 2003 agreements.  Unlike the 2003 Agreement, the 2006 Agreement:  (a) does not include a definition of site license in Section 1.7; (b) provides that an audit undertaken by Accusoft to determine distribution fees due is "final and dispositive, Section 3.6; (c) provides that Accusoft may terminate for material breach by giving 10, instead of  30 days written notice, Section 7.2; and, (d) adds to the existing choice of law provision that any action shall be brought only in Massachusetts, Section 9.6.  (Docket #182-3).

representative could inspect the work as it progressed, that no work could be covered up without the owner's consent, and that any work so covered could be exposed at the contractor's expense on the owner's request, the plaintiff's claim was not inherently unknowable." Id.  The Melrose court explained its rationale was based on the "sound policy" that there should be no advantage to the position of ignorance or carelessness, and that a statute of limitations would have no purpose if it could be evaded for an indefinite length of time by a party who claimed ignorance or carelessness. Id. at 35.  See also Town of Framingham v. Natick Mall, LLC, 28 Mass. L. Rptr. 540, 2001 WL 3524404, at *6 (Mass. Super. June 14, 2011) (the wrong "must be incapable of detection by the wronged party through the exercise of reasonable diligence.").

Applying these principles here, I recommend that Accusoft not be permitted to rely on the discovery rule to toll the six-year statute of limitations for its breach of contract claims. Accusoft included in the 2001 Agreement the right to audit MedPlus.  The 2001 Agreement provides in relevant part:

> Upon Accusoft's request, at mutually agreeable times no more frequently than once annually, an auditor chosen by Accusoft shall be provided reasonable access during normal business hours to the records of Licensee for the purpose of an audit of Distribution Fees due.  Such records shall include, without limitation, information concerning copies of the Application made and distributed and other information necessary to verify the payments and amount due Accusoft hereunder.

(Docket #182-1, Section 3.6) (emphasis added).  A nearly identical provision appears in Section 3.6 of the 2003 Agreement.  (Docket #182-2).  If Accusoft had exercised its option to audit, two things could have happened.  One, it could have discovered accounting discrepancies between the number of distributions MedPlus was reporting and Accusoft's understanding, in light of its interpretation of "concurrent user," of what should have been reported.  Or two, as Accusoft suggested at oral argument, Accusoft could have conducted the audit, but found nothing unusual

because MedPlus (either negligently or intentionally) failed to accurately report its distributions. However, following the rationale of <u>Melrose</u>, Accusoft should not be rewarded for failing to exercise its right to conduct an audit that it included in its agreements with MedPlus.  For this reason, as a matter of law, Accusoft's breach of contract claim was not inherently unknowable. Therefore, there should be no tolling of the statute of limitations.  The statute of limitations dates back six years in time from the date Accusoft filed the complaint.  Accusoft filed its complaint on November 14, 2011.  Applying the statute of limitations, it is this court's recommendation that Accusoft shall be barred from recovering for causes of action that accrued before November 14, 2005.

Defendants also separately argue that the six year statute of limitations necessarily bars claims for use of Version 11.  They rely on the notion that ImageGear Version 11, which is governed by the 2001 Agreement, was included in ChartMaxx Versions 3.1, 3.2, and 3.3 only, and that ChartMaxx customers could not have received Version 11 after December 2004 when ChartMaxx version 3.4 began incorporating Version 13.  According to Defendants, all customers purchasing ChartMaxx for the first time after December 2004 would have received ChartMaxx Version 3.4, which Defendants assert did not include Version 11.  (Docket #422, ¶ 9).   The factual premise of this argument is undermined by Accusoft's expert, Matthew Decker.  Mr. Decker avers that he searched ChartMaxx source code and he discovered ImageGear Version 11 in ChartMaxx Versions 3.4, 4.0, 4.1, 5.0, 5.5, 5.6, 6.1, and 6.1a.[22]  (Docket #472-2).  It is also

---

[22]   Defendants claim that Mr. Decker cannot know which versions of ImageGear were in ChartMaxx because he never reviewed any ImageGear source code or the copyright deposit material for ImageGear.  Defendants' argument misses the important points that (a) Defendants admit that they copied ImageGear object code, and (b) Mr. Decker has submitted several expert reports in this case, including reports with specifics regarding his efforts to identify ImageGear code in Defendants' software.  The court is convinced that there is at least a factual dispute whether Defendants' ChartMaxx product (in every version at issue here) contains Version 11.

unclear whether customers who purchased ChartMaxx versions 3.1, 3.2 and 3.3, were still able to use those versions after November 14, 2005.  The competing statements from the parties' witnesses, and the uncertainty regarding how the software was used and updated, means that Defendants have not persuaded this court that the statute of limitations necessarily bars claims stemming from the 2001 License Agreement (or even the 2003 License Agreement for that matter).  There are simply factual disputes that make summary judgment improper.

A closer call is presented regarding eMaxx, which is an application in which only Version 11 appears.  Accusoft seeks damages for Defendants' distribution of its software via servers because the 2001 Agreement limited distribution to "concurrent user" licenses; and, MedPlus never purchased server licenses for Version 11.  As is discussed in Section C supra, in response to a court order, Defendants reported to the court that eMaxx users accessed a ChartMaxx print server which would assemble the requested pages so that they could be printed by the end user using a local printer.  (Docket #304).  Based on this disclosure, Defendants argue that MedPlus never "distributed" ImageGear through eMaxx because they did not provide a copy of the software to users; instead they loaded it on their own servers.  Moreover, Defendants offer evidence to suggest that this particular use of ChartMaxx through eMaxx would be rare, and that Accusoft cannot prove a user actually accessed or used ImageGear in this way.  Accusoft contends that creating an option for an end user to access ImageGear is a distribution.

In my view, Accusoft's position has more merit.  By creating a path for a user to choose an option that would trigger accessing ChartMaxx through eMaxx, Defendants, it could be maintained, distributed eMaxx.  Even though the only version of ImageGear implicated in such function is Version 11, Defendants have not established that a user could not have used

ImageGear Version 11 in this way after November 14, 2005 (the time within the six-year statute of limitations).  Moreover, Defendants' disclosure in discovery that they "sunsetted" or retired this function does not provide a time period in which the sunsetting occurred.  Accordingly, I recommend that Accusoft be permitted to prove at trial whether Defendants distributed ImageGear in eMaxx in violation of the 2001 Agreement, but that the period for calculating damages be limited to the six-year limitations period.


IV.    CONCLUSION

For the reasons stated, I recommend that all four motions for summary judgment (Dockets # 412, #413, #417, and #425) be denied.  Moreover, with respect to trial of this matter, and to the extent this assists the District Judge, I recommend that the Massachusetts Statute of Limitations, Mass. Gen Laws ch. 260, § 2, be applied to limit Accusoft's recovery for any breach that occurred to six years before Accusoft filed its complaint.[23]

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[23] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within 14 (14) days after being served with a copy thereof.